**IRAN EXPRESS LINES, Appellant,**

v.

**SUMATROP, AG, a Foreign Corporation, Central Soya, International and Central Soya Co., Inc., Appellees.**

**No. 76–2290.**

United States Court of Appeals, Fourth Circuit.

Argued April 5, 1977.

Decided Oct. 5, 1977.

Francis J. Gorman, Baltimore, Md. (James W. Bartlett, III, and Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellant.

Robert H. Williams, Jr., Baltimore, Md. (Niles, Barton & Wilmer, Baltimore, Md., on brief), for Sumatrop, AG.

Edward S. Digges, Jr., Baltimore, Md. (Paul V. Niemeyer and Francis B. Burch, Jr., Baltimore, Md., on brief), for Central Soya Co., Inc. and Central Soya International.

Before WINTER, BUTZNER and HALL, Circuit Judges.

BUTZNER, Circuit Judge:

The principal question raised by this appeal is whether freight for a partial shipment of cargo which had been loaded aboard a vessel is subject to maritime garnishment. The district court held that it was not because the affreightment contract was executory. We believe that the contract was sufficiently executed to sustain the garnishment, and consequently, we reverse.

Iran Express Lines filed this suit in admiralty against Sumatrop AG a foreign corporation, for damages resulting from the alleged breach of a time charter. To provide security for a favorable arbitration award, which Iran Express anticipated, the complaint requested the issuance of a maritime garnishment against Central Soya International and Central Soya Company of all freights and effects of Sumatrop in their hands. Iran Express also asked for a stay of the trial against Sumatrop pending arbitration.[1] The district court properly granted the stay, and consequently, the only issue

---

1. Iran Express relied on Supplemental Rule B for Admiralty and Maritime Claims, Federal Rules of Civil Procedure for the garnishment and on 9 U.S.C. § 8 for the stay pending arbitration.

on this appeal is the validity of the garnishment.

## I.

Sumatrop had agreed with Soya to carry 10,000 tons of soybean meal from Baltimore, Maryland, to several European ports for freight of $100,000. Loading of a vessel operated by Sumatrop commenced in Baltimore on April 30, 1975, but it stopped at midnight because of a strike by grain elevator employees after only 3,456 tons had been loaded.

The record shows that on April 30 and May 9, Iran Express caused writs of garnishment to be served on Soya to attach freight for the soybean meal that had been loaded. Sumatrop entered a general appearance at 1:20 p.m. on May 12, 1975, and at 2:13 p.m. on the same day, Soya answered that the freight was not payable because the bills of lading had not yet been surrendered.

The evidence discloses that Soya and Sumatrop agreed on a freight of $35,000 for the partial shipment of the cargo which had been loaded on April 30. Bills of lading dated April 30, 1975, were signed and surrendered to Soya sometime after 2:00 p.m. on May 12, 1975. Soya, assured of indemnification, then paid the $35,000 freight to Sumatrop, and the partially loaded vessel left Baltimore on May 13, 1975.

Contending that Soya owed the freight to Sumatrop when the writs of garnishment were served, Iran Express sought an order requiring Soya to deposit $35,000 in the registry of the district court. The court denied the motion. It reasoned that contingencies arising from the strike could have excused Soya's performance of the voyage charter for the shipment of the soybean meal. It therefore ruled that the contract was executory and that the freight could not be garnisheed before Sumatrop entered its general appearance. It also ruled that Sumatrop's general appearance, though obviously timed to precede the delivery of the bills of lading, nullified the garnishment

writs, and therefore the freight could not subsequently be garnisheed.[2]

## II.

The grain voyage charter executed by Sumatrop and Soya provided in part:

Freight is to be fully Prepaid in United States Currency to Morgan Guaranty Trust . . . New York . . . for immediate cable transfer to Den Danske Landmandsbank . . . Copenhagen . . . Credit Sumatrop, Ltd., upon surrender of signed Bills of Lading and to be deemed earned on cargo as loaded on board, discountless and non-returnable, vessel and/or cargo lost or not lost.

The district court properly held that the "deemed earned" clause dealt with the risk of loss and did not fix the time at which the freight became due. It also properly ruled that the freight became due and payable on surrender of the signed bills of lading. *Cf. Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 191–92 (9th Cir.1962).

However, the time at which the freight became due and payable according to the terms of the charter party does not determine the validity of the garnishment, because maturity of the debt is not a prerequisite for garnishment. *See Robinson v. Shearer & Sons, Inc.*, 429 F.2d 83, 85 (3d Cir.1970). An unmatured debt may be garnisheed provided it arises from an executed contract. *See Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 193 (9th Cir.1962); 7A Moore's Federal Practice ¶ B.04, at B–160 to B–161 (2d ed. 1976).

Therefore, the critical question is this: When did the contract for affreightment become executed? The answer can be determined by examining the authorities dealing with a ship's lien on the cargo for freight. Maritime law affords a ship such a lien unless it is displaced by an inconsistent

---

**2.** The district court also ruled that it should not decline jurisdiction and that the freight could be attached in Maryland. Neither Soya nor Sumatrop has assigned error in these rulings.

provision in the charter party. *The Eddy,* 72 U.S. (5 Wall.) 481, 493–94, 18 L.Ed. 486 (1866). The existence of this lien depends on an executed contract of affreightment; the ship cannot assert a lien for the breach of an executory contract. Execution of the affreightment contract occurs when the cargo is delivered to the ship. *Bulkley v. Naumkeag Steam Cotton Co.,* 65 U.S. (24 How.) 386, 393–94, 16 L.Ed. 599 (1860); G. Gilmore & C. Black, The Law of Admiralty § 9–22 at 637 (2d ed.1975). If the contract is only partially performed, the lien attaches to the extent that the cargo has been delivered. *See Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364 (1923); G. Gilmore & C. Black, The Law of Admiralty § 9–23 at 639 (2d ed.1975); 1 Benedict, Admiralty § 185 at 11–16 (7th ed.1974).

■ These principles of maritime law and the undisputed facts establish that as of May 9, when the second writ of garnishment was served, the contract of affreightment had been partially executed, and the vessel had a lien on the 3,456 tons of meal that had been loaded. We therefore conclude that since the contract was partially executed, the writ effectively garnisheed the freight on the loaded cargo. The partial execution of the contract was sufficient to sustain the garnishment even though the bills of lading had not yet been delivered and the debt was unmatured. *Cf. San Rafael Compania Naviera v. American Smelting & Refining Co.,* 327 F.2d 581 (9th Cir. 1964) (writ served June 5 validly attached freight payable June 11); *see* 7A Moore's Federal Practice ¶ B.05 at B–207 (2d ed. 1976).

■ The recognition that a contract which is executed for the purpose of perfecting a vessel's lien for freight is also executed for the purpose of garnisheeing the freight does not prejudice either the shipper or the vessel. Pursuant to Supplemental Rule B(3)(a) the shipper can retain the freight, subject to the order of the court, or pay it into the registry of the court to discharge the lien, and the vessel then can assert such rights as it may have to recover the deposit.

We believe the district court erred when it ruled that "because numerous contingencies could have occurred which would have excused garnishee's [Soya's] performance under the voyage charter . . . ." the contract was still executory on May 9. Sumatrop and Soya did not plead that any such contingencies existed or were likely to occur, and the record discloses none. The court did not specify the contingencies to which it referred, and it cited no authority for its ruling.

■ Indeed, the charter party itself dispels any notion that contingencies arising from the strike would excuse Soya's performance. It provides that the vessel is to have a lien on the cargo for freight. No clause in the charter party conditions the creation of this lien on surrender of the bills of lading or on the absence of a strike. Surrender of the bills of lading fixes the time when payment of the freight becomes due, but it does not defer creation of the lien. G. Gilmore & C. Black, The Law of Admiralty, § 9–22 at 638 (2d ed.1975).

Furthermore, the charter party expressly defined Soya's obligations. It required Soya to load the vessel within a specified time and to pay demurrage of $3,500 a day unless the delay was caused by a strike. It also provided that neither party could claim damages against the other by reason of a strike. These provisions are the only protection the charter party afforded Soya in the event of a strike. The charter party did not excuse Soya from performing its part of the agreement because of contingencies that might arise from a strike. If the parties had wished to excuse Soya upon the occurrence of certain contingencies, they could have contracted to do so, but we perceive no justification in this record for engrafting such a provision on the charter party.

In sum, neither maritime law nor the charter party postponed partial execution of the affreightment contract because of the strike. Furthermore, the subsequent agreement of the parties to sail with a

partially loaded vessel did not have that effect. This agreement simply provided that partial execution of the contract, with freight pro rated for the cargo that was loaded, would be deemed full execution.

Consequently, we conclude that Soya's indebtedness to Sumatrop for freight on the loaded cargo, though unmatured on May 9, was subject to garnishment.

In view of our disposition of the case, we need not consider Iran Express's alternative ground for reversal which deals with the circumstances of Sumatrop's general appearance. The judgment of the district court is reversed. On remand the court should require Soya to deposit $35,000 in its registry.

K. K. HALL, Circuit Judge, concurring:

I concur with the result of the majority opinion, but for a different reason.

The contract between Sumatrop and Soya called for delivery on board of 10,000 tons of soybean meal. Until the entire amount was delivered on board, nothing was due Sumatrop upon which garnishment could attach, unless there was an agreement between the parties to alter the contract to accept partial performance. I cannot agree with the majority opinion that the executory contract in this case became executed as the meal was loaded. If that had been the case, the amount due from Soya would have been $34,560 instead of $35,000. To the contrary, as the majority opinion states, evidence discloses that Soya and Sumatrop agreed on a freight of $35,000 for the partial shipment. In my opinion, the key to this case is the date of agreement as to the $35,000. From the record, the exact date cannot be determined with certainty, however, I am persuaded and a reasonable view of what occurred indicates that it was after April 30 and before May 9.

It is unreasonable to believe that the sequence of the events of May 12 happened by accident. The circumstances make it plain that the defendants got together, agreed to the reduced shipment, and tried to figure a way to defeat the attachment of April 30. This resulted in the delayed surrender of the bills of lading and the appearance by Sumatrop. The writ of garnishment of May 9 issued in the meantime. The defendants attempted to use the law in such a way as to avoid its sting. This court is not restrained from proceeding backward from known facts to find what previously occurred.

I believe the court below erred in allowing carefully arranged timing and connivance to skirt equity and to defeat the attachment.

I would reverse and remand this case on equitable grounds rather than equating the creation of the ship's lien for freight with a partial execution of the contract for affreightment.