**REIBOR INTERNATIONAL LIMITED, Plaintiff-Appellant,**

v.

**CARGO CARRIERS (KACZ–CO.) LTD., Defendant.**

**Manufacturers Hanover Trust Company and the Royal Bank of Canada, Garnishees-Appellees.**

**No. 645, Docket 84–7724.**

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1985.

Decided April 8, 1985.

Terry L. Stoltz, New York City (Burlingham Underwood & Lord, Lance A. Warrick, New York City, of counsel), for plaintiff-appellant.

Robert M. Rosenblith, New York City (Janice A. Katz, New York City, of counsel), for garnishee-appellee Mfrs. Hanover Trust Co.

Robert W. Brundige, Jr., New York City (Sage Gray Todd & Sims, John A. Forlines, III, New York City, of counsel), for garnishee-appellee The Royal Bank of Canada.

Before OAKES, CARDAMONE and PIERCE, Circuit Judges.

OAKES, Circuit Judge.

This case involves the validity of a maritime garnishment served before the garnishee comes into possession of the property to be garnished. Finding no established precedent on point, the United States District Court for the Southern District of New York, Charles E. Stewart, Judge, looked to New York law for guidance in fashioning suitable federal common law as this court did in *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50, 52–53 (2d Cir.1965). Deferring to the state's judgment as expressed in N.Y. Civ.Prac. Law § 6214(b) (McKinney 1980), and expanded in McLaughlin, Practice Commentary C6214:3, following N.Y. Civ. Prac. Law § 6214(b), the district court found such a levy absolutely void. We affirm.

## FACTS

Appellant Reibor International Limited ("Reibor") made several attempts to garnish funds to be remitted to defendant Cargo Carriers (KACZ–CO.) Ltd. ("Cargo") under a letter of credit as the funds were transferred from the Madrid branch of Manufacturers Hanover Trust Co. ("MHT/Madrid") to the Royal Bank of Canada at Montreal ("RBC/Montreal"), through the New York branches of both banks ("MHT/NY" and "RBC/NY"). Each Process of Maritime Attachment and Garnishment was served either before the garnishee received the funds or after the garnishee had transferred them. Thus, two Processes were served on MHT/NY, on January 28, 1983, and on February 8, 1983, but it was not until February 11, 1983, that MHT/Madrid instructed MHT/NY to make an interbank transfer to RBC/NY through the Clearing House Interbank Payments System ("CHIPS"), a system for the electronic transfer of funds among member banks through a central

computer.[1]  Similarly, a third Process was allegedly [2] served on RBC/NY on February 11, 1983, at about 10:25 a.m., but RBC/NY did not receive the CHIPS credit in the amount of $180,000 until 2:21 that afternoon.  A fourth Process, served on February 14 or 15, came too late: RBC/NY had wired the money to RBC/Montreal at 3:22 p.m. on February 11.

Although the facts necessary to decide the case are thus simply stated, the import of the decision only becomes clear upon realizing how common is the relationship between Reibor and Cargo in international trade, and how frequent, therefore, the need for a fund transfer through New York.  Reibor, the owner of a vessel, and Cargo, a Canadian charterer, entered into a charter party on June 10, 1982, in which Reibor undertook to carry to Jordan cement supplied by the Spanish company Transportes y Comercio Internacionales, S.A. ("Tracoisa").  Six months later Reibor sought to attach Cargo's property pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Admiralty Rules") when it brought suit in the Southern District of New York on January 27, 1983, alleging Cargo's failure to perform its obligations under the charter.  The funds Reibor sought to garnish were Tracoisa's payment to Cargo for arranging the charter, MHT/Madrid having issued a letter of credit for the account of the consignee in Jordan for the benefit of Tracoisa as the means by which Tracoisa would be paid for its cement.  Tracoisa in turn issued irrevocable instructions to MHT/Madrid to remit a portion of the proceeds under the letter of credit to RBC/Montreal for Cargo's benefit in U.S. dollars.  These funds passed through New York branch banks to effect the exchange into dollars.

## DISCUSSION

Both MHT/NY and RBC/NY argue that the District Court was correct in its reasoning and in its application of New York law.  Both also argue that a CHIPS credit is not property subject to attachment under the Admiralty Rules.  And RBC/NY argues that the attachment order insufficiently identified the property to be attached, under *Cotnareanu v. Chase National Bank*, 271 N.Y. 294, 2 N.E.2d 664 (1936).  We affirm the district court in all respects and do not reach the additional arguments urged by MHT/NY and RBC/NY.

Preliminarily we note that this case does not involve an issue of branch bank autonomy.  A venerable line of cases holds that branches are autonomous for maritime attachment purposes, *see, e.g., Det Bergenske*, 341 F.2d at 53, although recently District Judge Whitman Knapp departed from this tradition to hold that service of a restraining notice at a bank's main office is effective against a branch account where main office computers monitor checking accounts at all branches.  *Digitrex, Inc. v. Johnson*, 491 F.Supp. 66, 68–69 (S.D.N.Y. 1980).  *But see Therm-X-Chemical & Oil Corp. v. Extebank*, 84 A.D.2d 787, 444 N.Y. S.2d 26 (1981) (traditional rule not obsolete

---

1.  The New York Clearing House Association operates CHIPS.  A member bank such as MHT/NY uses CHIPS when it receives a telex, usually from a customer but in this case from an overseas branch of the bank, MHT/Madrid, with directions to make a payment to another member bank, here RBC/NY, either for the account of one of that bank's customers or, as in this case, for further transfer.

  To effect the transfer, a CHIPS computer operator at a terminal located in the paying or sending bank programs the payment order and transmits it to the central CHIPS computer, which stores it and then causes a sending form to be typed at the sending bank.  After the sending bank approves the payment, this form is reinserted in the computer and "released."  At the moment of release, the central computer directs the terminals at the receiving bank and the sending bank to print out a credit ticket and a debit ticket;  respectively credits and debits the appropriate Clearing House bank accounts;  and records the transfer.  The receiving bank keeps track of funds received and makes them available immediately.  Adjustments in the account books at the New York Federal Reserve Bank are not made until the next business day, however, after the central computer has determined which banks owe, or are owed, what.

2.  RBC/NY disputes the service of this attachment order, but has offered to assume that it took place for purposes of this appeal.

when bank lacked centralized computer records). The issue is not before us because Reibor makes no claim either that the service on MHT/NY reached funds in Madrid or that the later service on RBC/NY reached funds in Montreal. Rather, it seeks to sustain the attachment as having intercepted funds as they made their way through New York.

■ Reibor bases its first argument on federal law. Rule B of the Admiralty Rules permits a plaintiff to attach an absent defendant's property if the plaintiff has an admiralty or maritime claim *in personam*. *See* 7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ B.03 (2d ed. 1983). Federal law generally governs questions as to the validity of Rule B attachments. *See Maryland Tuna Corp. v. The MS Benares*, 429 F.2d 307, 321 (2d Cir.1970); *Esso Standard (Switzerland) v. The S/S Arosa Sun*, 184 F.Supp. 124, 127 (S.D.N.Y.1960). Reibor argues that under federal maritime law a Rule B attachment is and stays valid until the garnishee answers, whether or not the garnishee possesses the property at the time of service. For this proposition Reibor cites three cases, *Iran Express Lines v. Sumatrop, AG*, 563 F.2d 648 (4th Cir.1977); *American Smelting & Refining Co. v. Naviera Andes Peruana, S.A.*, 208 F.Supp. 164 (N.D.Cal.1962), *aff'd sub nom. San Rafael Compania Naviera, S.A. v. American Smelting & Refining Co.*, 327 F.2d 581 (9th Cir.1964); and *DK Manufacturing Co. v. S.S. Titan*, 1964 A.M.C. 78 (S.D.N.Y. 1963).

■ The Admiralty Rules themselves offer little guidance. Rule B does not mention attachment of after-acquired property. Two other rules, Rule C and Rule E, appear to contemplate service on garnishees actually in possession of the property to be attached, but neither addresses the issue of after-acquired property directly. Rule C(3) provides only that if intangible property is the object of an *in rem* action, "the clerk shall issue a summons directing any person *having control of the funds* to show cause why they should not be paid into court to

abide the judgment" (emphasis added), and Rule E(4)(b) directs that process of attachment of tangible property be left "with the person having possession or his agent." We read these rules not as prohibiting attachment of after-acquired property but as demonstrating only that attachment is impossible unless the person or institution possessing the property is contacted at some point.

■ Like the Admiralty Rules, the federal cases cited to us by Reibor only obliquely graze the issue before us. *Iran Express Lines* is clearly distinguishable. That case involved the maritime garnishment of freight for a partial shipment of soybean meal before the freight had come due. The court upheld the garnishment of the unmatured debt only because the partial execution of the contract of affreightment gave the vessel a lien on the meal. 563 F.2d at 650–51. The case, we think, stands not for the proposition that after-acquired property (the freight) may be garnished, but that maturity of the debt is not a prerequisite for garnishment, provided that the unmatured debt arises from an executed contract. *See Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 193 (9th Cir.1962). Significantly, the *Iran Express Lines* court did not even analyze the power of the garnishment to reach after-acquired property, although the shipper's debt matured within hours of receipt of the writ of garnishment and the freight was actually paid the next day. If anything, then, *Iran Express Lines* cuts against Reibor and stands for the proposition that service of a garnishment order is only effective against property then in the hands of the garnishee.

Similarly, in *American Smelting & Refining Co.*, the question of after-acquired property was neither argued nor discussed, and the holding implicitly supports not Reibor, but appellees. The case involved three writs of attachment on the same property, all served by Schirmer Stevedoring Company, on June 5, June 8, and June 11. If the June 5 writ had reached after-acquired property, presumably the later writs would

not have had any bearing on the case. But the district court did consider the June 11 writ significant, holding that "[i]f the attachment becomes effective when the freights are earned, Schirmer was the first attaching creditor [on June 5] *after* the freights were earned," 208 F.Supp. at 171 (emphasis added), and, alternatively, "[i]f the attachment is effective only when the freights become payable, Schirmer was the first to attach *at that time* also (*June 11*)," *id.* (emphasis added). Thus, the district court appears to have assumed that the June 5 writ could not have attached after-acquired property and that writs of attachment generally are of no use unless served either at the time the attachment becomes effective or afterwards, not before. The court of appeals, while pointing to the trial court's findings and conclusions, did not address the issue.

Appellant's final federal authority, *DK Manufacturing*, is somewhat obscure, as Judge Stewart noted below, and again does not seem to address the issue at hand. The garnishee in *DK Manufacturing*, 1964 A.M.C. at 79–80, apparently had in its possession at the time of service a letter of credit that referred to the freights sought to be garnished, but failed to identify the freights until sometime later. As we see it, the freights were not subsequently acquired but subsequently identified.

■ In short, we agree with the district court that the precedent in federal admiralty law is so thin that we should turn to state law more directly on point. We clearly have this option where we find it appropriate.[3] *See California ex rel. State Lands Commission v. United States*, 457 U.S. 273, 283, 102 S.Ct. 2432, 2438, 73 L.Ed.2d 1 (1982) ("It may be determined as a matter of choice of law that, although federal law should govern a given question, state law should be borrowed and applied as the federal rule for deciding the sub-

stantive issues at hand."); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1942). And we think it especially appropriate where, as here, "a decision ... contrary to the general rule of the state might have disruptive consequences for the state banking system." *Det Bergenske*, 341 F.2d at 52–53 (citation omitted). New York being the situs for multiple transactions in world commerce, the New York banking system is particularly vulnerable to such disruption. Often, when a person in one foreign country makes a payment in U.S. dollars to someone in another foreign country, the payment clears through New York. In this case for MHT/Madrid to pay U.S. dollars to RBC/Montreal it was necessary to effect the transfer through MHT/NY, where MHT/Madrid maintained a dollar account. It is only appropriate therefore that we look to the New York law of attachment for guidance.

New York law seems clear:

A levy by service of an order of attachment upon a person other than the defendant is effective only if, *at the time of service*, such person owes a debt to the defendant or such person is in the possession or custody of property in which such person knows or has reason to believe the defendant has an interest

. . . .

N.Y. Civ.Prac.Law § 6214(b) (emphasis added). As stated by then Dean, now Judge, Joseph M. McLaughlin in the Practice Commentary: "Where the order of attachment is left with a third-party garnishee ..., the levy is absolutely void unless the garnishee has some property belonging to the defendant or owes the defendant a debt at the time the order is left with him." McLaughlin, *supra*, C6214:3.

Reibor argues, however, that the New York rule has no purpose except in the

---

**3.** *Maryland Tuna Corp.*, 429 F.2d at 321, is not to the contrary, despite its strong language that maritime attachment, "under the terms of Rule B(1), is completely independent of state law" and that "[s]tate law is irrelevant to the validity of process under Supplemental Rule B(1)."

Here, as a matter of federal law, we choose to follow the applicable state law. State law remains irrelevant to the validity of a maritime attachment because it is federal law that determines what attachments are valid.

specific context of New York attachment law. It points out that under section 6214(b) a levy, once effective, remains effective for at least ninety days, during which time it reaches all after-acquired property. In declaring a levy void as against garnishees who have none of defendant's property at the time of service, therefore, section 6214(b) protects uninvolved garnishees from the "intolerable burden ... to be vigilant for the subsequent ninety days lest any property of the defendant come into their possession." *Id.* In contrast to New York law, the Admiralty Rules do not specify the period during which an effective levy remains effective, but Reibor contends that a maritime levy remains effective until the garnishee answers, under Rule B(3) a period controlled by garnishee and not exceeding twenty days. Hence, according to Reibor, the Admiralty Rules would not place a burden to be vigilant on uninvolved garnishees, and there is no reason to follow the New York rule that a levy is ineffective if the garnishee does not possess the property subject to garnishment.

Reibor's argument fails to sway us. First, it minimizes the burden of remaining vigilant even for the limited time until a garnishee can answer a levy. It takes time to answer, as Rule B(3) recognizes in giving a garnishee twenty days. It is indeed burdensome to require a garnishee to choose between setting aside other priorities to answer promptly and remaining vigilant until an answer can be prepared. Second, Reibor's argument wrongly assumes that we turn to state law solely to effectuate state purposes. Rather, we turn to state law partly to minimize disruptive divergences between state and federal law. Freeing garnishees from the burden of keeping track of yet another difference between state attachment law and admiralty attachment law has value in and of itself.

Appellant also argues that despite the explicit language of section 6214(b), the New York courts will hold an attachment effective against property acquired within just a few hours of service. Two cases are said to support this view. One is a case decided by Justice Schimmel of the City Court of New York, *Ratto v. Italia, Flotte Riunite Cosulich,* 171 Misc. 426, 12 N.Y. S.2d 617 (City Ct.1938), *aff'd* (App.Term May 24, 1939). *Ratto* upheld an attachment of a shipment, which had arrived at the pier and was in custody of United States Customs officials, even though the garnishee ship owner did not have custody of the goods shipped and did not receive the bill of lading until about two hours after the warrant was served. Paying lip service to the rule that "[a]n attachment, of course, speaks only as of the time the levy is made," 171 Misc. at 429, 12 N.Y.S.2d at 620, the court nevertheless reached the conclusion that the levy was effective because "[i]t is as if the service of these papers and the surrender of the bill of lading were effected simultaneously and the intervening fraction of a day is to be disregarded," 171 Misc. at 430, 12 N.Y.S.2d at 620.

*Ratto* may have been a fair and equitable decision. After all, the garnishee presumably knew that its ship with its cargo had arrived in port, and expected delivery of the bill of lading within a short time. Whatever its fairness, however, the decision is hardly likely to be followed by any New York court considering facts like those before us. For one thing, neither MHT/NY nor RBC/NY could have foreseen their respective roles in the CHIPS transfer. For another, the *Ratto* court did not have strong precedent to support its holding. It cited only two cases, introduced by the signal "Cf." Both date from the middle of the last century and concern the effectiveness of bringing suit by serving the complaint on a defendant before filing it with the court, an issue not closely analogous to that before us. *See Rusk v. Van Benschoten,* 1 How.Pr. 149 (1845); *Hughes v. Patton,* 12 Wend. 234 (1834). Finally, rough justice in a case involving as did *Ratto* $1,440.43 might be extremely rough justice in a case involving $180,000, as does this.

The other case relied upon by Reibor is now senior District Judge Thomas Mur-

phy's *Shurtleff v. Huber*, 186 F.Supp. 241 (S.D.N.Y.1960). In *Shurtleff*, the plaintiff sought to attach a debt allegedly due the defendants by the garnishee, underwriter Kidder, Peabody & Co. The issue was whether defendants had an actionable claim against Kidder at 10:40 a.m., May 18, 1960, when the attachment order was served. *Id.* at 242. Kidder had earlier agreed to purchase defendants' stock at a 10:00 a.m. closing that day, had already resold the stock to the public by that time, written the check, and received all pertinent documents in good order. However, the closing time was informally postponed at the last minute to 11:00 a.m., for Kidder's convenience, and the certificates were not actually exchanged for the check until that afternoon. Kidder thus received the attachment order before the closing took place. *Id.* at 242–43. Judge Murphy, however, held that "there was no manifest intent to alter the binding terms of the underwriting agreement by which the rights of the parties were to accrue as of 10 a.m.," *id.* at 244, and that therefore the 10:40 a.m. levy was effective to attach a debt actionable as of 10:00 a.m.

This holding obviously has no bearing on the issue before us. Reibor, however, focuses on the court's alternative holding: in the alternative, the court stated that it "would reach the same conclusion," *id.* at 245, even if the rights of the parties had not accrued until the delayed closing time of 11:00 a.m., because Kidder had an absolute obligation certain to become due at that time. Reibor is clutching at straws. This alternative holding recalls *Iran Express Lines*, in upholding the garnishment of an unmatured, but actionable, debt. Admittedly, the *Shurtleff* court expanded the definition of "absolute obligation" to include an obligation that Kidder could have terminated under the underwriting agreement, though only for breach of warranty. But even this expanded definition does not help Reibor, since Reibor cannot argue that either garnishee in this case had even a conditional obligation to Cargo when they received process of attachment. Reibor can only use *Shurtleff* to illustrate a certain limited flexibility in the courts toward New York attachment law, as shown by Judge Murphy's words, "[p]erhaps we are in effect recognizing an instance in which the law of attachment should bend slightly to embrace the reality of the situation presented." *Id.* Tellingly, Judge Murphy justified this flexibility by citing *Ratto, supra.*

As Reibor argues, then, these two cases, the federal one relying on the City Court's, bent New York attachment law in view of the equities of the situation. Neither case, however, leads us to believe that either we should or the New York courts would depart from the letter of N.Y.Civ.Prac.Law § 6214(b) to the extent Reibor envisions. Neither *Ratto* nor *Shurtleff* involved bank transfers, and both involved garnishees that fully expected to come into possession of the property sought to be attached within a matter of hours. The potential for disruption for inequity in this case stands in sharp contrast. Here, the law of attachment could have considerable impact on international banking practices and indeed could force New York banks clearing foreign fund exchanges in U.S. dollars through CHIPS to search high and low for a period of up to twenty days to determine whether any transfer related to a maritime process of attachment or garnishment. Moreover, this search would be extremely and unfairly taxing because garnishee banks like MHT/NY and RCB/NY have no way to anticipate when they will transfer or receive a CHIPS credit. The reason for following the New York rule seems plain. The rule works, to be sure, to the detriment of an attaching creditor, but that is simply the way the law was intended to operate.

While the other questions briefed by the parties are interesting, we reserve them for another day when somebody has served a writ of attachment on a bank either after it has received instructions from its forwarding bank to transfer a CHIPS credit but before it has made the transfer, or after it

has received a CHIPS credit but before it has transferred any funds related thereto.

Judgment affirmed.