**CLIPPER SHIPPING CO., LTD.**

v.

**UNIMARINE BULK TRANSPORT, INC., Defendant,**

**and**

**Navios Corporation, Garnishee.**

**Civ. No. B–90–519 (JAC).**

United States District Court, D. Connecticut.

March 12, 1992.

David J. Burke, Gregory J. Ligelis, Robinson & Cole, Stamford, Conn., for plaintiff Clipper Shipping, Ltd.

John P. Love, New Canaan, Conn., LeRoy Lambert, Healy & Baillie, New York City, for Garnishee Navios Corp.

RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GARNISHEE NAVIOS CORPORATION'S CROSS MOTION FOR AN ORDER VACATING ORDERS OF ATTACHMENT AND ISSUANCE OF PROCESS

JOSÉ A. CABRANES, District Judge:

This is a factually complex case arising within the admiralty jurisdiction of the federal courts. It involves application of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). The particular question presented is whether freight due by the terms of a charter party upon the surrender of bills of lading may be garnished before bills of lading have been presented but after the vessel in question has been loaded. Plaintiff Clipper Shipping Co., Ltd. ("Clipper") has moved for summary judgment against garnishee Navios Corporation ("Navios"). Navios has moved to have the court's prior orders of attachment and issuance of process vacated. For the reasons stated below, Plaintiff's Motion for Summary Judgment (filed Mar. 11, 1991) is denied, and Navios' Cross–Motion for an Order Vacating Orders of Attachment and Issuance of Process (filed Apr. 3, 1991) is granted.

## BACKGROUND

This lawsuit results from disrupted relations among several parties in the business of chartering vessels for the transport of commercial freight. Clipper is a business entity organized under the law of the Channel Islands and maintains a place of business in Fredensborg, Denmark. Complaint ¶ 2. Defendant Unimarine Bulk Transport, Inc. ("Unimarine"), is a Liberian corporation with a business address in Monrovia, Liberia. *Id.* ¶ 3. Unimarine has not appeared in this action. Garnishee Navios is apparently an American corporation[1], *id.* ¶ 12; it has its principal place of business in Stamford, Connecticut. Affidavit in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Garnishee's Cross–Motion for an Order Vacating Orders of Attachment and Issuance of Process (filed Apr. 3, 1991) ("Hedger Affidavit") ¶ 2.

Clipper is the "disponent owner"[2] of the M/V ENVIKI. On or about March 22, 1990, Clipper chartered the ENVIKI to Unimarine for a voyage from a United States Gulf Coast port to a port or ports in Japan. Affirmation of Oscar Sundwall (filed Apr. 24, 1991) ("Sundwall Affirmation") ¶ 2. Pursuant to the charter party,[3] the ENVIKI loaded a cargo in New Orleans and transported it to the ports of Nagoya and Kinuuita, Japan. Under the terms of the charter party, the "freight"— that is, the charge for transporting the cargo—due to Clipper from Unimarine was $1,373,142.69. *Id.* ¶¶ 3–7. On April 18, 1990, Unimarine remitted an "on account" payment to Clipper in the amount of $1,291,320.91, leaving a balance due of $81,821.78. On or about June 13, Clipper

1. The record does not disclose Navios' state of incorporation.

2. "A 'disponent' shipowner does not own the vessel but leases it or otherwise obtains it for the necessary shipping period." *Farmland Industries, Inc. v. Grain Board of Iraq,* 904 F.2d 732, 734 (D.C.Cir.1990).

3. "A charter party is a specialized type of maritime contract for the hire of a vessel." Thomas J. Schoenbaum, *Admiralty and Maritime Law,* § 10–1 at 381 (West, 1987).

forwarded to Unimarine its calculation of the balance due to Clipper. On or about July 5, 1990, Unimarine advised Clipper that it accepted Clipper's calculation and that a remittance would be forthcoming. Nonetheless, Unimarine made no further payments to Clipper. *Id.* ¶¶ 7–9. Subsequent to the filing of Clipper's motion for summary judgment in this case, arbitrators in London, acting pursuant to an arbitration clause in the charter party between Clipper and Unimarine, awarded Clipper the unpaid balance of $81,821.78. Affirmation of Steven Ian Wallace (filed Apr. 24, 1991) ¶¶ 2–4. Unimarine has yet to pay the award. Sundwall Affirmation ¶ 10.

In an unrelated transaction, on April 6, 1990, Navios entered into a contract of affreightment[4] with Mitsubishi Corporation ("Mitsubishi") for the carriage of three bulk cargoes of grain from U.S. Gulf Coast ports to Japan. Mitsubishi was to provide the cargo and Navios was to provide the vessels. The attachment in this case relates to transactions concerning the shipment of the third cargo of grain. Hedger Affidavit ¶¶ 6–7. Mitsubishi purchased this grain from Agrex, Inc. ("Agrex"), which was to be paid from proceeds of a letter of credit established by Mitsubishi upon presentation of bills of lading. *Id.* ¶ 7. On July 13, 1990, Navios entered into a charter with Unimarine pursuant to which Unimarine undertook to provide a vessel to transport the third cargo of grain. *Id.* ¶ 9.

Rider Clause 9 of the charter party between Navios and Unimarine provided in part as follows:

> Once Bills of Lading have been signed and Charterers call for surrender of Original Bills of Lading, it will be incumbent upon Owners [i.e., Unimarine] or their agents to comply immediately with such call for surrender failing which Owners to be held responsible for any

and all consequences arising therefrom ... Freight to be prepaid in New York, in U.S. Currency on Bill of Lading weight on surrendering of signed Original Bills of Lading to Charterers [i.e., Navios] or their agents in New York....

*Id.* ¶ 10. Navios had specifically negotiated for this provision making surrender of the bill of lading a precondition of payment. It knew that Unimarine did not own the vessel it was contracting to provide and therefore could not directly control the issuance and surrender of bills of lading. The party from whom Unimarine was chartering the vessel would issue and surrender the bill of lading to Navios only after Unimarine had paid.[5] Navios did not want to run the risk of having to pay the freight twice, that is, once to Unimarine, and, in the event that Unimarine then failed to pay the party controlling the vessel, a second time to that party. *Id.* ¶ 11.

The charter between Navios and Unimarine also provided, in Clause 6, that "Vessel to have a lien the cargo for all freight, deadfreight, demurrage, or average. Charterers' liability under this Charter to cease on cargo being shipped, except for freight/deadfreight and demurrage." Hedger Affidavit, Ex. 5. This standard provision simply provided that the owner of the vessel would have a lien on the cargo for the charges in shipping it, and that once the cargo was shipped the charterer (Navios) would not have any liability other than for the charges for shipping the cargo.

In order to fulfill its obligation of providing a vessel to ship the third cargo of grain, on September 19, 1990, Unimarine entered into a charter with Casinomar Transportation, S.A. ("Casinomar"), for the M/V ASCENSION. The terms of this charter were identical to those of the charter between Navios and Unimarine, with the important exception of a higher freight rate. *Id.* ¶ 12. As a consequence, Unima-

---

**4.** "The parties to a contract of carriage or affreightment are called respectively the *shipper* and the *carrier.*" Schoenbaum, § 9–2 at 278 (emphasis in original).

**5.** "An order bill of lading states that the goods are consigned to a specified person.

"An order bill of lading is negotiable by endorsement of the order party and delivery of the bill." Schoenbaum, § 9–8 at 299. Surrender of the bill of lading is thus essential to control over the cargo.

rine stood to lose a substantial amount of money on the transaction. The ASCEN-SION is owned and managed by Italian companies (not by Casinomar) and flies the Italian flag. Reply Affidavit in Support of Garnishee's Cross–Motion for an Order Vacating Orders of Attachment and Issuance of Process (filed May 10, 1991) (Affidavit of LeRoy Lambert) ¶ 2. The ASCENSION commenced loading grain in the Mississippi River above New Orleans on October 14, 1990. Hedger Affidavit ¶ 13.

Given the complexity of the two transactions involved here, the following review chart may perhaps be useful.

---

**TRANSACTION ONE**

CLIPPER (disponent owner ENVIKI)
↓
UNIMARINE (charters ENVIKI from Clipper March 22, 1990)

**TRANSACTION TWO**

MITSUBISHI (buys grain from Agrex)
↓
AGREX (collects on Mitsubishi letter of credit on
   ↓   presentation of bill of lading)
   ↓
NAVIOS (charters ASCENSION from Unimarine July 13, 1990;
   ↓   paid by Agrex October 16, 1990)
   ↓
UNIMARINE (charters ASCENSION from Casinomar
   ↓      September 19, 1990)
   ↓
CASINOMAR (controls ASCENSION)

---

In the days prior to October 14, 1990, Casinomar, apparently bypassing Unimarine, contacted Navios about payment of the freight on the grain cargo. Navios responded that under its charter with Unimarine the freight was not due until surrender of the bills of lading. For its part, Casinomar maintained that it was not obligated to surrender bills of lading until it was paid the freight due under its charter with Unimarine. *Id.*

On October 16, 1990, Agrex paid Navios the freight due under the contract of affreightment between Navios and Mitsubishi, which was $1,116,881.36. Reply Affidavit in Support of Garnishee's Cross–Motion for an Order Vacating Orders of Attachment and Issuance of Process (filed May 6, 1991) (Affidavit of Paul L. Hedger) ¶ 2. With the grain cargo loaded aboard the ASCENSION, Agrex demanded the bills of lading from Navios, Navios demanded the bills of lading from Unimarine, and Unimarine presumably demanded the bills of lading from Casinomar. Hedger Affidavit ¶ 15. In response to this impasse, on October 16, 1990, Navios by telex proposed a compromise tripartite escrow agreement providing for simultaneous payment of freight and surrender of bills of lading. Unimarine rejected this proposal by telex on the morning of October 17, 1990. *Id.* ¶ 17.

Shortly after noon on October 17, 1990, in connection with Clipper's suit against Unimarine on the first transaction described above, Navios was served with this court's Order for Issuance of a Writ of Attachment and Garnishment and Order for Process Issued Pursuant to Rule B(1) of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of

the F.R.C.P. ("Garnishment Order"), both filed at 10:31 a.m. that day. The Garnishment Order directed the United States Marshal for the District of Connecticut to attach

> credit and effects [of defendant Unimarine] to the amount sued for, in the hands of NAVIOS CORPORATION, Stamford Harbor Park, 333 Ludlow Street, Stamford, Connecticut 06902–6913, to wit: cash, funds, debts, freights, sub-freights, hire and amounts due from NAVIOS CORPORATION to defendant. . . .

After service of the Garnishment Order, Navios transferred $876,821.78 to its attorneys to hold in escrow for Unimarine pending completion of the ASCENSION charter party transaction. This amount represented the amount that would be due to Unimarine from Navios under the charter party, less $81,821.78, which was the amount of Clipper's garnishment in the Garnishment Order. Affidavit of Mark C. Flavin (filed Mar. 7, 1991) ("Flavin Affidavit"), Ex. 9 (Deposition of Paul L. Hedger) ("Hedger Deposition") at 46. Navios never set aside or segregated the $81,821.78 sum it had retained. Hedger Deposition at 47. With respect to the $876,821.78 in escrow, Navios' irrevocable instructions to its attorneys were to pay the escrow sum to Unimarine upon confirmation that the ASCENSION bills of lading had been surrendered. On October 18, Unimarine rejected this arrangement, declaring it a repudiation of its charter with Navios. Unimarine stated that it was no longer a party to any charter with Navios, and suggested that Navios negotiate directly with Casinomar. Hedger Affidavit ¶¶ 19–20, Ex. 14 (telex from Unimarine to Navios). Navios accordingly considered that it owed no freight to Unimarine on the charter. *Id.* ¶ 23.

Navios therefore contacted Casinomar to inquire whether Unimarine had repudiated its charter with Casinomar as well, and was informed that it had not. *Id.* ¶ 24. Navios and Casinomar exchanged copies of their respective charters with Unimarine. The copy of the charter Navios sent to Casinomar disclosed the freight rate Navios had contracted to pay, but the copy of the charter Casinomar sent did not disclose the rate Unimarine had contracted to pay Casinomar. Although Casinomar's motive is irrelevant, most likely this was because the rate Unimarine had contracted to pay Casinomar was below the then-prevailing market rate, although it exceeded the rate Navios had contracted to pay Unimarine. Navios states that it hoped to assume Unimarine's position vis-a-vis Casinomar and thereby minimize the damage from its loss of its bargain with Unimarine. Late on October 18, 1990, however, Casinomar sent a telex to Navios declaring that Unimarine's repudiation of the charter with Navios resulted in a repudiation of Unimarine's charter with Casinomar, and proposed that Navios pay the supposed prevailing rate, which, as just noted, was significantly higher than both what Navios had contracted to pay in its charter with Unimarine, and what Unimarine had contracted to pay Casinomar. *Id.* ¶¶ 12, 24–25.

Navios then had Unimarine assign its charter with Casinomar to Navios on October 19, 1990. *Id.* ¶ 26, Ex. 17. Navios informed Casinomar of the assignment, and arranged for payment to Casinomar of the full amount that would have been due to Casinomar under the charter between Casinomar and Unimarine—namely, $1,010,511.70. Casinomar asserted in response that the charter between Unimarine and Casinomar had been repudiated by Unimarine and was therefore not assignable. Nonetheless, Casinomar was willing to accept the tendered payment "as partial payment of freight reserving all rights against Unimarine and or Navios and or cargo owners for payment of full market freight and our damages." *Id.*, Ex. 18. Upon receipt of the $1,010,511.70, Casinomar issued bills of lading, but included the phrase "freight partially prepaid," rendering them commercially worthless. *Id.*, ¶ 30.

Navios strongly protested, and after negotiations with Casinomar's counsel, agreed to deposit in escrow an amount equal to the difference between the freight that would be due under the Casinomar charter with Unimarine and the supposed prevailing market rate sought by Casinomar. This difference amounted to $225,-

012.73. Casinomar then issued unqualified bills of lading. Casinomar and Navios also agreed to have their dispute arbitrated. *Id.*, ¶¶ 31–33.

## DISCUSSION

Clipper has moved for summary judgment against Navios for the freight Navios is said to have owed Unimarine on October 17, 1990, and Navios has moved to have the order of attachment issued on that date dissolved. The question presented by both parties' motions is whether Navios had any credits or effects of Unimarine reached by the Garnishment Order. Authority on the issue is quite thin, and neither party has cited any admiralty cases directly in point. The starting point must be the decision of the Court of Appeals in *Reibor International Limited v. Cargo Carriers (KACZ–CO.), Ltd.*, 759 F.2d 262 (2d Cir.1985). That case held that Rule B attachments reach only property in possession of the garnishee at the time of the attachment. Accordingly, the question here becomes whether Navios had any credits or effects of Unimarine on the afternoon of October 17, 1990, when it was served with the Garnishment Order.

Navios argues that delivery of a bill of lading by Unimarine was a condition precedent of any debt it might owe Unimarine, and since Unimarine had failed to deliver a bill of lading, Navios did not owe any debt to Unimarine. I agree. The express terms of Navios' charter with Unimarine made surrender of the bills of lading a condition precedent of payment of the freight. Moreover, this provision had a compelling commercial rationale, to wit, Navios' need to avoid the possibility of paying the freight on the grain cargo twice in order to obtain the bill of lading. As noted earlier, the bills of lading were essential to control over the cargo of the vessel, and would be

demanded by Agrex, which needed to present the bills of lading to Mitsubishi's bank in order to collect on the Mitsubishi letter of credit.

It is a fundamental principle of the law of attachment and garnishment that "the attaching creditor can get no more than the debtor has." *Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 193 (9th Cir.1962). Indeed, the Court of Appeals for the Second Circuit has noted that while an unmatured debt may be subject to Rule B attachment, "the unmatured debt [must arise] from an executed contract." *Reibor*, 759 F.2d at 265, *citing Schirmer Stevedoring Co.*, 306 F.2d at 193. This rule comports with the law of attachment outside the admiralty context. *See, e.g., Dick Warner Cargo Handling Corp. v. Aetna Business Credit, Inc.*, 700 F.2d 858, 862 (2d Cir.1983) ("Connecticut cases require that for a debt to be subject to garnishment, the debt must be due and not contingent.").[6]

Clipper relies principally on *Iran Express Lines v. Sumatrop, A.G.*, 563 F.2d 648 (4th Cir.1977), for the proposition that Navios' charter with Unimarine had been executed by the afternoon of October 17, 1990, when the Garnishment Order was served on Navios. In that case, as here, the garnishee's charter with the defendant provided that "Freight is to be fully Prepaid ... upon surrender of signed Bills of Lading...." *Id.* at 650. The garnishee argued that because bills of lading had not been surrendered at the time of the attachment, it did not owe a debt to the defendant at the time of the attachment. The Court of Appeals for the Fourth Circuit held that partial loading of the cargo on a vessel sufficiently executed the executory contract of affreightment so as to make the freight on the contract subject to attachment. In de-

---

**6.** Navios argues that insofar as this case might not be resolved by federal admiralty precedents, the court should look to state law precedents on related issues, as the Court of Appeals did in *Reibor*, where it applied New York law. Navios' further suggestion that the court should look to the law of Connecticut in particular is erroneous. In *Reibor*, the court looked to the law of New York, the locus of that case, because New

York is a maritime and financial center and commerce would be served by the uniformity of state and federal laws of attachment. *Reibor*, 759 F.2d at 267. The law of Rule B attachments remains a matter of federal common law, *id.* at 265, and Connecticut is not such a maritime center that particular deference to its law, as opposed to that of other states, is appropriate or necessary.

termining whether the contract of affreightment had been executed, the court looked to admiralty law governing a ship's lien on the cargo for freight. Because a lien exists on the cargo to the extent it has been loaded, the *Iran Express Lines* court concluded that "[t]he partial execution of the contract was sufficient to sustain the garnishment even though the bills of lading had not yet been delivered and the debt was unmatured." *Id.* at 651. Concurring in result only, Judge Hall disputed the majority's contention that the contract was sufficiently executed by partial loading of the cargo before bills of lading had been presented. Judge Hall would have permitted recovery against the garnishee on equitable grounds because the facts clearly indicated that the defendant and the garnishee had conspired to defeat the attachment. *Id.* at 652.

Because the ASCENSION had begun loading on October 14, 1990, and Navios was served with the Garnishment Order on October 17, 1990, Clipper contends that Navios' charter with Unimarine was sufficiently executed at that time so as to give rise to a debt owing from Navios to Unimarine subject to attachment. Clipper supports this contention by noting that under Clause 6 of Navios' charter with Unimarine the vessel was to have a lien on the cargo.

Clipper's argument based on Clause 6's provision of a lien is not in point. The *Iran Express* court looked to the time when liens arise under the common law of admiralty simply as an analogy in determining when the contract was executed. The case did not turn on the existence of liens in the particular matter at hand; nor is it relevant here.

In any event, to the extent that the supposed rule of *Iran Express* might be extended to facts such as these, the rule is unsound. *Iran Express* may have been rightly decided, as Judge Hall suggested, in view of the apparent conspiracy of debtor and garnishee to defeat the attachment in that case. But to hold the contract to have been executed prior to delivery of bills of lading would unsettle established principles of commercial intercourse in the circumstances presented here. At the time of the Garnishment Order, Unimarine would have had no claim against Navios. At that point it had not provided Navios with anything. To be sure, the grain had been loaded aboard the ASCENSION by October 17, 1990, but there was no guarantee that Unimarine would perform on the contract—no guarantee that the grain would be shipped to Japan or the bill of lading delivered to Navios. On the morning of October 17, 1990, Unimarine had rejected Navios' proposal of a tripartite escrow agreement whereby Navios would pay Unimarine, Unimarine would pay Casinomar, and Casinomar would surrender the bills of lading to Navios. Particularly in light of Casinomar's inquiries to Navios about the possibility of direct payment in the days prior to October 14, 1990, it was apparent Unimarine might not make good on its obligations, as proved to be the case. To hold that Navios owed Unimarine a debt on the afternoon of October 17, 1990, would work precisely the mischief Navios had expressly contracted to avoid, namely the need to pay twice for the same shipping services.

Although the facts of this case are comparatively complex, the deciding principle is simple and well-settled: an attaching creditor can get no more than the defendant debtor has. Because Navios did not owe a debt to Unimarine when it was served with the Garnishment Order on October 17, 1990, plaintiff's motion for summary judgment must be denied, and the Garnishment Order must be vacated.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (filed Mar. 11, 1991) is DENIED. Garnishee Navios Corporation's Cross–Motion for an Order Vacating Orders of Attachment and Issuance of Process (filed Apr. 3, 1991) is GRANTED. The court's Order for Issuance of a Writ of Attachment and Garnishment (filed Oct. 17, 1990) and Order for Process Issued Pursuant to Rule B(1) of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the

F.R.C.P. (filed Oct. 17, 1990) are VACAT-ED. The Clerk shall dismiss this case with prejudice as against garnishee Navios Corporation.

It is so ordered.