## NELSON *v.* KINNEY.

### (*Nashville.* February 17, 1894.)

1. FRAUDULENT CONVEYANCE. *What is not, between husband and wife.*

A conveyance by a husband to his wife, at a time when he is solvent, and not in anticipation of insolvency, and without any intent to defraud existing or subsequent creditors, in consideration of his moral duty to provide for her and to protect her against his recklessness, dissipation, and gambling debts, is not fraudulent as against creditors of a firm of which he is a member, whose debts were contracted without knowledge of the property conveyed to the wife. (*Post, pp. 440, 441.*)

2. SAME. *What is not, between parent and child.*

A father has the right, upon becoming insolvent and unable to provide for his debts, owing to general financial depression throughout the country, to prefer a debt due his daughter, by conveying property to her in which he has an equitable interest, and such conveyance, made in good faith, is not fraudulent as against his creditors or creditors of a firm of which he is a member.

---

### FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. ANDREW ALLISON, Ch.

JOHN RUHM & SON and JAMES TRIMBLE for Nelson.

VERTREES & VERTREES for Kinney.

WILKES, J.  This is a creditor's bill to set aside
an alleged fraudulent conveyance.  It was filed
April 25, 1892, and. alleges that, on August 15,
1891, George S. Kinney, G. P. Lipscomb, and R.
R. Reno, partners doing business at Nashville
under the name of Kinney & Co., were indebted,
by note, to Charles Nelson in the sum of $81,-
546.69.  On that day, the Kinney Distilling Com-
pany, a corporation that succeeded Kinney & Co.
in business at Nashville, executed its notes in the
stead, and in satisfaction of, the notes of Kin-
ney & Co.  These notes were indorsed by George
S. Kinney, G. P. Lipscomb, and R. R. Reno, the
individual members of the old firm of Kinney &
Co.  It further alleges that, on August 15, 1891,
when the notes of the Kinney Distilling Company
were executed, it was understood that the original
indebtedness of Kinney & Co. was not to be can-
celed.  Ten of these notes were paid, leaving fifty
notes, aggregating $67,955.59, unpaid, and *these* notes
are sued on in the bill.

Charles Nelson died on December 11, 1891, leav-
ing a will, whereby he bequeathed the most of
his property to his wife, Mrs. Louisa Nelson.
These notes were transferred to her in part pay-
ment of the legacy due to her, and she *alone* it is
who now sues upon the notes as the holder thereof.

The bill further alleges that, on April 19, 1892,
George S. Kinney conveyed a certain house and
lot on Cedar Street, in Nashville, of which he was
the owner, to his daughter, Mrs. Ittie K. Reno,

for an *alleged* consideration of $19,000, paid in a *credit on indebtedness* due to her. This is the conveyance which is attacked by the bill. It alleges that this conveyance is a voluntary conveyance; that it was made to defeat the creditors of Mr. Kinney and Mr. Reno; that there was no indebtedness (as recited in the deed) from Kinney & Co. to Mrs. Reno; that, if there was any such debt, it was not her separate estate, but was Mr. Reno's *jure mariti;* that a credit on the books of Kinney & Co., in favor of Mr. Reno, was transferred to Mrs. Reno's account to defeat the complainant; that this credit was not separate property, but belonged to Mr. Reno *jure mariti.*

The answer denies the allegations of the bill. It states, further, that George S. Kinney, G. P. Lipscomb, and R. R. Reno were indebted to Mrs. Ittie K. Reno in the sum of about $28,000. This money was due by note for loaned money, which they had borrowed a year or two before. It states that Mrs. Reno acquired the money she had loaned Kinney & Co. in this way: In August, 1888, Mr. Reno gave, and by deeds duly registered October 8, 1888, conveyed, to Mrs. Reno the remainder interest (after the death of his father, General Reno) in two tracts of land in Pennsylvania. These remainder interests were then worth less than $12,000. Some months afterward, General Reno died unexpectedly, leaving Mrs. Reno the owner of the land in fee. These lands were held by Mrs. Reno to her *sole, separate, and exclusive use.*

In June, 1889, after the life estate had fallen in,. she sold one piece for $12,000, and loaned the money to Kinney & Co.   Shortly afterward she mortgaged the other for $15,000, and loaned that to Kinney & Co.  For these loans they gave her their three notes.   July 10, 1892, the three notes were renewed by a note for $28,000, which included $1,000 of interest.

The answer further claimed that .the Cedar-street property was conveyed as a payment on the $28,-000 note. . She took it at a valuation of $28,000,. but there was a mortgage in favor of James Walsh for $8,700, which she assumed, and gave credit on the note to the amount of $19,300.   It alleged that, at the time Mr. Reno conveyed the lands to her, he owed nothing individually, and that Kinney & Co.—George S. Kinney and G. P. Lipscomb—had property and assets amply sufficient to pay all their debts, without including the property conveyed to Mrs. Reno.

The answer claimed that the conveyances to Mrs. Reno by Mr. Reno were made in good faith, without fraud, or even suspicion that ample property did not remain to pay all debts for which Mr. Reno was in any way bound; and that property and assets amply sufficient to pay every thing did remain after said conveyance to her.

It alleged that the notes of Kinney & Co.. *were canceled and delivered up* when the notes of the Kinney Distilling Company were executed, and collaterals were given with the company's notes which

Charles Nelson did not have before; also that there was no agreement that the notes of Kinney & Co. should not be canceled.

It also alleged that the conveyance by George S. Kinney was not voluntary, but was made in good faith to pay an honest debt that was justly due. Much proof was taken, and, on the hearing, the Chancellor, upon consideration of the whole case, dismissed the bill, and complainant, Mrs. Louisa Nelson, appealed, and has assigned errors, as follows:

*First.*—Because the conveyances by Reno to his wife, acknowledged on August 29, 1888, and recorded in Pennsylvania on October 8, 1888, were voluntary, and hence fraudulent as to complainant, who was a creditor.

*Second.*—Because the property conveyed by Geo. S. Kinney to his daughter, Mrs. Ittie K. Reno, was so conveyed, to the extent of $19,300 (the balance, $8,700, due on the mortgage being only assumed and still unpaid), in consideration of the debt due Mrs. Reno by Kinney & Co. for money realized from the sale and mortgage of the real estate fraudulently conveyed by Reno to his wife, as hereinbefore stated. The property so conveyed by Kinney is liable for the payment of complainant's debt.

*Third.*—Because Reno was insolvent when he made the voluntary conveyance to his wife, and had no property left to pay his liability to complainant; because his firm was insolvent at the

time, and never was out of debt to complainants from the time of Reno's voluntary conveyance to the filing of the bill of complaint; because the payments made to complainants during the period from the voluntary conveyance to the filing of the bill, when adding thereto new obligations created, did not suffice to discharge the indebtedness existing at the time.

*Fourth.*—Because the proof shows that Reno put into the firm, so as to acquire an interest in it, the sum of $15,000 as his part of the capital stock; that he gradually drew out that money so by him put into the firm; that, owning substantially no other property, he conveyed to his wife, as stated, the Pennsylvania realty, he and his firm being then insolvent, and heavily indebted to complainant and other creditors; that Mrs. Reno sold that property, and put the proceeds into the firm as a loan; that afterwards Mr. Kinney, one of the partners—the firm and all the partners being then insolvent and the old debt still existing—conveyed to Mrs. Reno his last piece of property in payment of the debt due her for money realized out of the Pennsylvania realty, which had been voluntarily and fraudulently conveyed to her by her husband.

*Fifth.*—Because upon the whole case, as set forth in the original bill and answer, and made out in the proof, full relief can be granted complainant.

Under the first assignment it was insisted the conveyances were fraudulent:

28—9 P

(a) Since Reno, by the several conveyances to his wife, which are shown in the record to have been made contemporaneously or about contemporaneously, and which were voluntary, rendered himself insolvent, having no other property remaining save his interest in the firm of Kinney & Co., and that firm being insolvent at the date of the conveyance.

(b) Since, at the time of the said voluntary conveyance, Kinney & Co., of which firm Reno was a member, were heavily indebted to complainant and other creditors; since they were insolvent; and since Reno had not sufficient property left to pay the debts due complainant, and other debts for which he was liable as a member of the firm.

(c) Since the debt due complainant was an existing debt; but it matters not whether it was an "existing debt" at the dates of the conveyances or a subsequent one.

(d) Since Reno made the conveyances to his wife with the "fraudulent intent" to hinder and delay his creditors.

The testimony in the case has taken a wide range under the charges in the bill, and the additional facts set up in the answer.

It appeared that George S. Kinney had been in the wholesale liquor business, at Nashville, as the leading, active member of six different firms or combinations, for about thirty years, and during twenty-six years of that time had been a constant, heavy customer of Charles Nelson, a distiller and

dealer in whiskies. Mr. Nelson died December 11, 1891. Up to that date Major Kinney's purchases from him amounted to over a million dollars, many of them on a credit, for which he paid at the rate of eight per cent. per annum, besides the profit on the whisky.

In 1878, G. P. Lipscomb married a daughter of Major Kinney, and was admitted to the firm. In 1885, R. R. Reno married Miss Ittie Kinney, another daughter, and he was admitted to the firm, buying out the fourth interest of Mr. McGlothlin at $15,000, which he paid. The firm name was then changed to Kinney & Co., of which the members and interests were as follows: Major Kinney, one-half; Mr. Lipscomb, one-fourth; and Mr. Reno, one-fourth. That is to say, the members of the family alone composed the firm. The same close relations existed at home. They all three, with their families, lived in the same household as one family, and have so lived continuously ever since.

The firm of Kinney & Co. continued in business from 1885 until August, 1891, when it was merged into a corporation—the Kinney Distilling Company. The business of Kinney & Co., during 1888, 1889, and a part of 1890, was large and prosperous. May, 1889, Kinney & Co. bought (mainly upon a credit) a distillery and a lot of whisky from Mr. John Woodard. They paid, and were to pay, $67,000. They began to operate the distillery, and, after making about 3,500 barrels of whiskies, closed down in May, 1890.

During the years 1890 and 1891, a large number of Kinney & Co.'s customers failed, owing to the stringency of the times, which culminated in the panic of 1892–3.

July 29, 1891, the Kinney Distilling Company, an incorporated company, bought out Kinney & Co., and soon after assumed the debt to Charles Nelson, in his life-time. The debt, August 15, 1891, when it was assumed, amounted to $75,100.92. Kinney & Co. gave their sixty notes, each for $1,359.12, aggregating $81,546.89. Ten of these notes were paid. This left fifty unpaid—or an aggregate of $67,955.59. Ten of these notes (the last to become due) were secured by a collateral vendor's lien note for $5,600, and 446 barrels of whisky, worth $7,100. The other forty notes were secured by certificates for 620 shares, of $100 each, of the stock of the Kinney Distilling Company.

All these fifty notes were made by the Kinney Distilling Company, payable to Charles Nelson, and indorsed individually by Mr. Kinney, Mr. Lipscomb, and Mr. Reno.

The 446 barrels of whisky, held as collateral, brought, since suit was instituted, $7,000. The $8,333.33 note, so far as appears, is good for the balance due of $5,600, and, as a consequence, the debt will be credited by about $15,500, which, exclusive of interest, would leave it about $55,000 at this time.

In view of these facts, it is insisted that there has been an entire novation of the debt; that the

notes of the corporation have been substituted for those of the firm; that these are secured, to some extent at least, by collaterals; and that Major Kinney, Reno, and Lipscomb are now only bound as indorsers for the corporation, which has become the principal debtor; and that this is the shape of the debt now sued on.

Appellants insist that it is not a novation, but a continuation of the old debt by the same debtors, under a new shape, but always the same in identity.

It appears that Mr. Reno paid Mr. McGlothlin $15,000 cash for his interest, which went to his credit in the firm. A considerable part of this was drawn out by Mr. Reno, who had fallen into convivial habits and become reckless of his money. May 24, 1888, he conveyed to his wife a phaeton and horse and $2,600 in money, and on July 27, 1888, a diamond cross, ear-rings, etc., which had been given them as bridal presents. These conveyances were for love and affection, and to the sole and separate use of the wife, and were both registered, when made, in Davidson County. August 29, 1888, he conveyed to her a house and lot in Harrisburg, Pennsylvania, and a tract of one hundred and ninety-five acres of land near that city, and the deeds were also for love and affection, and registered in Pennsylvania soon after being executed. The land was conveyed to Mrs. Reno's separate use, with power to sell as a *feme sole*. The $2,600 cash had never been in the firm

of Kinney & Co., and $2,300 was, soon after it was given, paid out for Mr. Reno's benefit by his wife.

The Pennsylvania property was incumbered by the life-interest of General Marcus Reno, the father of R. R. Reno, as tenant by curtesy. He was then fifty-five years of age, and the remainder interest thus conveyed was worth about $12,000 at the time of the conveyance. General Reno, however, died unexpectedly March 30, 1889, and Mrs. Reno became owner in fee of the Pennsylvania property. It was suggested to her by Mr. Lipscomb, the book-keeper and office man of Kinney & Co., that she sell it and loan the money to the company at eight per cent. interest. She did so. In June, 1889, she sold one piece for $12,000, and June 10, 1889, loaned the money to Kinney & Co., taking their note payable to herself. She mortgaged another piece for $15,000, and loaned the money to the company, taking notes, which then aggregated $27,000, from the firm. That the money represented by these notes was the proceeds of these lands there is no controversy. It appears that it was forwarded to her in New York exchange, to her order. She received it, loaned it to the firm, took the firm's notes, executed by Mr. Lipscomb, and Mr. Reno appears to have had nothing to do with it at any time.

July 10, 1892, the notes were consolidated into one for $28,000—$1,000 of interest being included. The original and consolidated notes are exhibited in the record.

Major Kinney built a house on Cedar Street, facing the Capitol, in 1888, and gave a mortgage to James Walsh for $15,000 upon the house and lot, to enable him to build it.

April 18, 1892, Major Kinney conveyed this property to Mrs. Reno, in part payment of the $28,000 note, she taking it at a valuation of $28,-000, but giving credit on her note for only $19,300, as $8,700 of the mortgage to Walsh was an incumbrance on it, which she assumed. These facts are recited in the deed.

The bill in this case attacks this deed from her father, but does not impeach the conveyances to Mrs. Reno by her husband, and makes no mention of them. It is insisted, however, that the scope of the bill and answer brings in question these conveyances by the husband to the wife, because, out of them arose the alleged separate estate and indebtedness to Mrs. Reno, and it is insisted that, inasmuch as the answer has opened up these transactions, their good faith may be questioned, to see whether there was any valid consideration for the transfer from the father to the daughter. Waiving the question of pleading, the Court thinks it best to decide the case upon its merits.

Much controversy is had over the condition of the firm of Kinney & Co., October 8, 1888, when the deeds were made by R. R. Reno to his wife. It is insisted, on the one hand, that the firm was abundantly solvent, and had an excess of fifty or sixty thousand dollars over its indebtedness. On

the other hand, it is insisted that the firm was insolvent by about the same amount. Both contentions are claimed to be proven by the books of the company—the results for appellants being arrived at by experts, and for appellees by the members of the firm.

Without going into an analysis of these figures and statements, which are very extensive and exhaustive, we are content to say that we are convinced that at this date (July, 1891), the firm of Kinney & Co. was abundantly solvent, and was believed by Nelson, as well as every one else, to be so. We are further convinced that Nelson did not look to Reno as adding any thing to the sufficiency of his debt, or the solvency of the firm, and did not even know of his Pennsylvania property, and, if he knew, did not care for the conveyances to his wife of that property as well as the personal property heretofore referred to.

That these conveyances by the husband to the wife were made in pursuance of a high moral duty which the husband, on account of his dissipated habits, owed the wife, we are convinced; and that, at the time they were made, they were without fraudulent intent as to creditors, is evident. We are of opinion that the husband's financial condition at that time warranted him, legally, 'in making the conveyances to the wife, for her protection against his recklessness and gambling debts; but they were not intended, nor was their effect, to avoid the claim or demand of any *bona fide*

creditor then existing or anticipated. No faith was given to this property by Mr. Nelson in dealing with the firm of Kinney & Co. It does not appear that these conveyances were made in view of any possible present or prospective insolvency of the firm of Kinney & Co., of which Mr. Reno was a member, but rather to protect his wife against his gambling propensities, which might involve him individually in the future.

If there had been fear, or even suspicion, of trouble as to the solvency of Kinney & Co., Mrs. Reno would not have loaned them this money without security, nor would her husband and father and brother-in-law have permitted her to do so.

We are of opinion that the conveyances made by Reno to his wife were not fraudulent as to creditors of Kinney & Co. The sales by her and the loan of the money to the firm by her was a *bona fide* transaction, in good faith, and she was a creditor of Kinney & Co. to the amount of her notes, and entitled to all the protection to which a *bona fide* creditor is entitled as against his debtor. If we are correct in this, and of it we have no doubt, the only remaining question is, Did Major Kinney, when misfortune overtook him in his business, and his property shrank, from the financial depression which swept over the country, until he was no longer able to conduct his business and provide for his debts, have any right to secure, in part, this debt due his daughter, by conveying to her this property, in which he had an equitable in-

terest, subject to the mortgage? That a debtor may provide for one creditor in preference to another, by a sale or special assignment, there is no doubt, and never has been in Tennessee. That it was a high moral duty to protect his daughter is as evident as that it was his legal privilege, provided always, that it was done in good faith. We are unable to place this case on any other basis than this, and this is conclusive of the case.

It is insisted that the debt sued on in this case was not in existence when the deeds were made to the wife; that the debts then existing have been paid, and whatever was unpaid by Kinney & Co. on August 15, 1891, was novated in the new debt by the Kinney Distilling Company on that date. And the following authorities are relied on: *Nichol* v. *Bate,* 10 Yer., 433; *Isler* v. *Baker,* 6 Hum., 185; *Cherry* v. *Frost,* 7 Lea, 6; *White* v. *Bettis,* 9 Heis., 649; *McDonough* v. *Elam,* 20 Am. Dec. (La.), 284; 2 Daniel Neg. Insts., Sec. 1266 (2d Ed.); *Stroud* v. *Rankin,* 2 Bax., 74.

We are inclined to think this position well taken, but it need not be decided in this case.

It is also insisted that, under the frame of the bill, the *bona fides* of the conveyances from the husband to the wife cannot be attacked in this case, because not referred to in the bill, and the following authorities are relied on: *Midmer* v. *Midmer's Ex'rs,* 12 C. E. Green, 548; *Andrews* v. *Farnham,* 2 Stockton, 91; *Howell* v. *Sebring,* 1 McCarter, 84; *Brown* v. *Bulkly,* 1 McCarter, 451; *Hoyt* v.

*Hoyt*, 12 C. E. Green, 402; *Auston* v. *Ramsey*, 3 Tenn. Chy., 118; *Merriman* v. *Lacefield*, 4 Heis., 210; *Johnson* v. *Luckadoo*, 12 Heis., 270; *Neal* v. *Robinson*, 8 Hum., 435; *Mulloy* v. *Young*, 10 Hum., 298; Gibson's Suits in Chancery, par. 542.

We have deemed it proper to consider the case on its merits, as disclosed by the answer and proof as well as by the bill.

A very able argument is made also on the construction of the Code (M. & V. compilation), §§ 2424 and 2430, the position maintained being that a voluntary conveyance to a wife cannot be set aside by subsequent creditors upon the ground that the husband was at the time in debt to existing creditors who remained unpaid; and the difference between the Act referred to (Code, § 2424) and the statutes of 13 and 27 Elizabeth is forcibly pointed out and commented upon, and the conclusion is tersely stated in *Lloyd* v. *Fulton*, 1 Otto, 485, as follows:

"The rule, as now established, is that prior indebtedness is only presumptive, and not conclusive, evidence of fraud, and this presumption may be explained and *rebutted*. Fraud is always a question of *fact* with reference to the intention of the grantor. Where there is no *fraud*, there is no infirmity in the deed. Every case depends upon its circumstances, and it is to be carefully scrutinized. But the vital question is always the *good faith* of the transaction. *There is no other test*." 1 Otto, 485.

To the same effect is 112 U. S., 149. "There

is no other test" than the *good faith* of the transaction, so far as *subsequent* creditors are concerned, and there cannot be under statutes like ours. There is no presumption of fraud, and fraud in *fact* must be *established;* and that is an "open question," to be determined *upon the facts. Laird* v. *Scott,* 5 Heis., 345; *Nicholas* v. *Ward,* 1 Head, 326.

We do not deem it necessary to pass upon this question in this case. When the facts are considered, there is no pretense of actual or intentional fraud in the present case. In the first place, as already shown, these persons all believed, in fact knew, that Kinney & Co. were doing a large and lucrative business, and that their assets were largely more than sufficient to pay every debt that they owed. Nothing was withdrawn from the *firm* assets. The deeds were promptly put to record, and no credit was extended to Reno on the assumption that he owned property in Pennsylvania. Indeed, he was supposed to have no property at all, Mr. Brengleman says. The debts due Charles Nelson were closed by note at the end of every month. All the debts contracted and notes made (and notes executed in renewal thereof) prior to October 8, 1888 (the date when the deed was registered), were *paid,* and paid in money. There is no evidence of any fraudulent design, or any "kiting" of debts, but every thing was open, public, and fair. Kinney & Co. were doing a business of $450,000 a year, and therefore dealing

Nelson *v.* Kinney.

with other persons more extensively than they dealt with Mr. Nelson.

Our conclusion is that there was no fraud in fact, or actual intention to defraud or delay any creditor, in the conveyances from Reno to his wife, or in that of Major Kinney to his daughter. The credit, in point of fact, was not extended upon the faith of Mr. Reno's property. There was, therefore, no fraud upon any creditors, either existing or subsequent, and, as a consequence, the conveyances to Mrs. Reno are unassailable, and the bill must be dismissed, with costs.