UNION PLANTERS NATIONAL BANK, Plaintiff-Appellee,

v.

WORLD ENERGY SYSTEMS ASSOCIATES; Nerco, Inc.; North Carolina National Bank; P & O Falcoal, Inc.; Cooper Stevedoring Company, Inc.; Western Alabama Mining Company; Bertel Shipping Company, Inc.; Johnstone, Adams, May, Howard and Hill; and J.M. Jackson and Associates, Inc., Defendants-Appellees,

v.

TEXAS CHARTERING, INC. and Hemmert International Corporation, Defendants-Appellants.

TEXAS CHARTERING, INC., and Hemmert International Corporation, Plaintiffs-Appellants,

v.

WORLD ENERGY SYSTEMS ASSOCIATES, INC.; Wesa, Inc.; Paul Liu; Ed Bales; Certain Funds, Letters of Credit, Assets, Accounts, Credits, Effects and Property, Tangible and Intangible of Defendants; Union Planters National Bank; and P & O Falcoal, Defendants-Appellees.

Nos. 86–5122, 86–5124.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 2, 1986.

Decided April 15, 1987.

Rehearing Denied June 30, 1987.

Joseph D. Cheavens (argued) Baker and Botts, Houston, Tex., Jef Feibelman, Burch, Porter and Johnson, Memphis, Tenn., for defendants-appellants.

Marion S. Boyd, Jr., Thomas J. Walsh, Jr., Memphis, Tenn., James Newsom, Hanover, Walsh, Jalenak & Blair, Memphis, Tenn., for Nerco, Inc., defendants-appellees.

Robert D. Dearborn (argued), Charlotte, N.C., for North Carolina Nat. Bank.

Dennis B. Ragsdale, Kennerly, Montgomery & Finley, P.C., Knoxville, Tenn., for defendants-appellees.

Thomas S. Rue, Mobile, Ala., Thomas J. Walsh, Jr., Memphis, Tenn., Marion S. Boyd, Thomas W. Bell, Jr., Memphis, Tenn., for P & O Falcoal.

Before JONES and RYAN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Appellants, Texas Chartering, Inc., and Hemmert International Corp. (Texas/Hemmert), appeal from the district court's entry of summary judgment in two actions: No. 86–5122 (the "interpleader action"), and No. 86–5124 (the "attachment action"), 642 F.Supp. 50. For the reasons set forth below, we affirm both judgments.

Defendant-appellee World Energy Systems Associates, Inc. (WESA) is an international coal trader. Appellants Texas/Hemmert are judgment creditors of WESA, said debts arising out of transactions not directly related to the cases at bar. Among the various other appellees in these consolidat-

ed actions is Union Planters National Bank (Union Planters), which acted as the advising bank in a letter of credit transaction under which WESA was the named beneficiary. The remaining appellees are third-party assignees of proceeds under that letter of credit.

In early 1983, WESA arranged a sale of coal to a company in Taiwan. Payment was to be made via a letter of credit. To this end, Citibank of Taipei issued a letter of credit with WESA as the named beneficiary. Manufacturers Hanover Trust Company of New York served as the reimbursing bank and Union Planters of Memphis acted as the advising bank, which meant, *inter alia*, that Union Planters actually handled any disbursements to the beneficiary. Payment of the proceeds under the letter of credit was absolutely contingent on the presentation of documents conforming to the requirements listed in the letter. In effect, the required documents would establish that coal of conforming quality and quantity had been loaded aboard the ship and was en route to its destination (the purchaser in Taiwan).

The letter of credit is a commonly used means of payment in international business transactions because it assures the purchaser that payment will not be effected unless and until the seller has performed, but it also allows the seller to finance the sale by providing an easily assignable domestic contract right. Presentation of conforming documents was to be made to the advising bank (Union Planters) which would then notify the reimbursing and issuing banks. The reimbursing and issuing banks had no obligation under the letter of credit until all conditions had been met. Likewise, Union Planters, as advising bank, had no obligation to WESA until strictly conforming documents were tendered and the funds were transferred to it.

Union Planters took actual possession of the original letter of credit from WESA for a number of reasons, not the least of which was safekeeping (the original letter of credit was one of the documents required to be presented). Union Planters also had a perfected security interest against WESA arising from a past, unrelated debt. To facilitate the underlying sale and shipment of coal, and to satisfy certain prior debts, WESA made a total of 12 "irrevocable assignments" of portions of the proceeds under the letter of credit to Union Planters and the third-party assignees between February 25 and March 16, 1983. These partial assignments were made by telex from WESA to Union Planters, and essentially stated that WESA irrevocably assigned any rights it might have to a specified portion of the proceeds under the letter of credit to a certain named creditor. Union Planters would then confirm these assignments by notifying the specified assignee of the assignment. Totalled out, the various partial assignments exhausted the entire proceeds due under the letter of credit.

Texas/Hemmert did not receive assignments under the letter of credit from their debtor WESA. Nevertheless, Texas/Hemmert and another judgment creditor, Furness Withy (not a party to the instant appeals), learned of the transaction and the letter of credit. On March 15, 1983, Texas/Hemmert filed the instant attachment action against WESA. Pursuant to Rule B(1) of the Supplementary Rules for Certain Admiralty and Maritime Claims, Texas/Hemmert attempted to secure WESA's appearance and to secure satisfaction of any future judgment against WESA by serving a writ of maritime attachment and garnishment on Union Planters. The writ was to be issued against all of WESA's assets then under the control of Union Planters. Pursuant to Rule B(3)(a), Union Planters responded to the writ on March 23, 1983, stating that at the time the writ was served, the only property of WESA in the hands of Union Planters was a small checking account, the balance of which had already been set off by Union Planters in satisfaction of the bank's prior perfected security interest. The writ was, therefore, returned by Union Planters to Texas/Hemmert unsatisfied.

On March 16, 1983, WESA presented to Union Planters a set of documents intended to meet the requirements of the terms of the letter of credit. Union Planters rejected this tender as not in strict conformance.

New documents in conformance were re-submitted to and accepted by Union Planters on March 23. Union Planters obtained the proceeds from Manufacturers Hanover on that same date. After setting off the amount assigned to it in satisfaction of its perfected security interest, Union Planters filed the instant interpleader action and deposited the remaining proceeds from the letter in the registry of the district court.

The district court ultimately granted summary judgment in both actions against Texas/Hemmert. That court held that the partial irrevocable assignments were effective and perfected under Tenn.Code Ann. §§ 47–5–116 and 47–9–305 (Supp.1986) (hereinafter [U.C.C.] §§ 5–116 and 9–305), because the letter of credit was possessed by Union Planters for its own behalf and as agent/bailee for the third-party assignees. The court also held that there was no evidence offered to support Texas/Hemmert's assertion that the assignments were designed by WESA as a fraud upon its creditors. Therefore, in the interpleader action, the district court ordered the funds on deposit in the registry of the court to be disbursed to the various third-party assignees. In the other case, the district court quashed the writ of maritime attachment because, at the time it was served, Union Planters held no attachable property belonging to WESA. As of March 15, 1983, the date of service of the writ, the letter of credit was still wholly executory—Union Planters had not received the proceeds under the letter and WESA's right to them had not yet come into existence. Since the Rule B(1) writ was ineffective against WESA's assets, the attachment case was dismissed. Texas/Hemmert appeal from these judgments.

## I.

The issue of the validity of the assignments is basically a dispute over the proper interpretation of the Uniform Commercial Code, as adopted in Tennessee. Section 5–116 of the code provides in pertinent part:

(2) Even though the [letter of] credit specifically states that it is nontransfera-ble or nonassignable the beneficiary may before performance of the conditions of the credit assign his right to proceeds. Such an assignment is an assignment of an account right under chapter 9 of this title on Secured Transactions and is governed by that chapter except that:

(a) the assignment is ineffective until the letter of credit or advice of credit is delivered to the assignee which delivery constitutes perfection of the security interest under chapter 9 of this title. . . .

Tenn.Code Ann. § 47–5–116(2)(a). Under the plain language of this statute, the assignment to Union Planters is valid because it was made before the performance of conditions and the letter of credit was in Union Planter's possession.

Difficulty arises, however, in the context of multiple partial assignments. Under subsection (2)(a), delivery to the assignee is an absolute prerequisite to effectiveness and perfection. Obviously, delivery of the same instrument to multiple assignees is impossible. The drafters of the uniform statute apparently proceeded on the assumption that the ordinary business practice under this section would be the issuance of "back-to-back" letters of credit. *See id.* comments 1 and 3. In the back-to-back situation, the advising bank holds the original letter of credit as assignee and issues separate, subordinate letters of credit with the seller's suppliers as beneficiaries. *See* White & Summers, *Uniform Commercial Code* § 18–9, p. 752 (2d ed. 1980). In the instant case, one back-to-back letter of credit was issued by Union Planters to P & O Falcoal, Inc. (WESA's coal supplier). For unexplained reasons, however, the remaining transactions were executed as partial irrevocable assignments.

Section 5–116(2)(a) should not, in our opinion, be read to *prohibit* multiple partial assignments of rights to proceeds as opposed to the use of back-to-back letters of credit. For one thing, the use of the singular term "assignee" should be interpreted to include the plural term "assignees." *See* Tenn.Code Ann. § 47–1–102(5)(a) (1979), U.C.C. § 1–102(5)(a). For another,

article 9 of the U.C.C., which § 5–116(2) says is controlling in assignment situations, seems to allow such multiple partial assignments:

A security interest in letters of credit and advices of credit (subsection 2(a) of § 47–5–116), ... may be perfected by the secured party's taking possession of the collateral. If such collateral ... is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained....

Tenn.Code Ann. § 47–9–305. Applying these two sections to hypothetical situations similar to the case at bar, at least three commentators have concluded that multiple partial assignments of a beneficiary's right to proceeds under an executory letter of credit are valid. *See* Anderson, *Uniform Commercial Code* § 9–305:12 (3d ed. 1985); Hawkland, *UCC Series* § 5–116:02, p. 230; Ufford, *Transfer and Assignment of Letters of Credit Under the Uniform Commercial Code*, 7 Wayne L.Rev. 263, 282–83 (1960).

Texas/Hemmert make a number of strained arguments that § 9–305 should not apply to this situation and, alternatively, that even if it does apply, Union Planters was not holding the letter of credit as an agent or bailee of the third-party assignees. None of these arguments is well taken. Initially, it must be recognized that § 9–305 applies by its very terms—it explicitly cross references to letters of credit under § 5–116(2)(a). Secondly, while there do not appear to be any published cases directly on point, analogous cases under § 9–305 have held that a senior assignee may hold collateral other than a letter of credit as agent/bailee for junior creditors where the holder receives notice of the other assignments and consents to abide by their terms. *See, e.g., Landmark Land Co. v. Sprague*, 529 F.Supp. 971 (S.D.N.Y. 1981), *rev'd on other grounds*, 701 F.2d 1065 (2d Cir.1983); *Craig v. Union County Bank (In re Crabtree)*, 48 B.R. 528 (Bankr.

E.D.Tenn.1985); *In re Chapman*, 5 U.C.C. Rep.Serv. 649 (Bankr.W.D.Mich.1968). There appears to be no reason to distinguish between an assignee holding a letter of credit and an assignee holding other collateral under § 9–305 for these purposes.

■ In the instant case, Union Planters received notice of WESA's "irrevocable assignments" to the third-party assignees, agreed to be bound by the terms of these assignments, and notified the various assignees accordingly. None of the third-party assignees objected to Union Planters acting on their behalf and there was no conflict of interest between Union Planters and the other assignees because the proceeds from the letter of credit were sufficient to cover all assignments. This arrangement satisfies the notice requirement of § 9–305, *see Looney v. Nuss (In re Miller)*, 545 F.2d 916, 919 (5th Cir.), *cert. denied*, 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977), as well as the Tennessee law requirements for the creation of a bailment, *Dispeker v. New Southern Hotel Co.*, 213 Tenn. 378, 373 S.W.2d 904, 908 (1963); *Merritt v. Nationwide Warehouse Co.*, 605 S.W.2d 250, 252 (Tenn.App.1980).

■ Finally, Texas/Hemmert claim that the grant of summary judgment was inappropriate because there existed material issues of fact as to whether the various partial assignments were carried out as a fraud upon WESA's creditors. The district court noted that no proof was tendered by Texas/Hemmert in support of this allegation. Texas/Hemmert respond that the mere fact that some of the assignments were made after service of the writ of attachment gives rise to a presumption of fraudulent intent. Under Tennessee law, a debtor has the right to prefer one creditor over another and such a preference does not, and cannot, give rise to a presumption of fraud. *Nelson v. Kinney*, 93 Tenn. 428, 442, 25 S.W. 100 (1894); *Bank of Hendersonville v. Dozier*, 24 Tenn.App. 178, 142 S.W.2d 191, 201 (1940); *Blackmore v. Parkes*, 81 F. 899, 900 (6th Cir. 1897). Any rule which prevents such pref-

erence is contrary to the public policy of that state. *Delaney Furniture Co. v. Magnavox Co.*, 222 Tenn. 329, 435 S.W.2d 828, 831–32 (1968). Accordingly, there is no material issue of fact on the allegation of fraudulent assignment and the grant of summary judgment in the interpleader case was appropriate.

## II.

With respect to the attachment case, the district court ruled that since there was no property of WESA within the control of Union Planters on the date of service of the writ, the writ was ineffective and void. The only published case directly on point is *Diakan Love, S.A. v. Al-Haddad Bros. Enter.*, 584 F.Supp. 782 (S.D.N.Y.1984). In that case, Morgan Guaranty Trust Company served as the advising bank in a letter of credit transaction under which Al-Haddad was beneficiary. While the letter of credit was still executory, Diakan served a Rule B(1) writ of maritime attachment on the bank seeking to attach Al-Haddad's interest in the credit. The court stated:

> [I]t would be stretching the conventional meaning of words to consider the beneficiary's interest in a letter of credit as either property in the hands of the bank or debt owed to it by the bank. This is absolutely clear as to the first letter on which Morgan's role was solely that of advising bank. Upon Al-Haddad's presentation of documents conforming to the letter Morgan would have had no obligation to pay; it would have been free at its election to advance funds, anticipating reimbursement by the issuing bank, or to decline to do so.

*Id.* at 784. Further, there was a second letter of credit with Al-Haddad as beneficiary on which Morgan served as the confirming, or reimbursing, bank (in the instant case, Manufacturers Hanover was the reimbursing bank). In this respect, the court stated:

> Even on Morgan's confirming role, however, it would be stretching conventions to conclude that, *prior to Al-Haddad's presentation of conforming documents,* Morgan was either indebted to Al-Had-

dad or held any of its property. Morgan had received no property of Al-Haddad. Its books would have showed no debt owed to Al-Haddad. What it had done by acceptance of the confirming role on Rafidain's [issuer] letter of credit was to undertake a commitment to Rafidain (which in turn had undertaken the same obligation to its customer), that, if and when Al-Haddad were to present conforming documents, Morgan would advance money against the letter for Rafidain's account. Although Morgan's acceptance of the confirming role made its payment of Rafidain's letter obligatory rather than optional, its commitment was nonetheless executory and contingent. The obligation of Morgan to pay would not arise unless and until Al-Haddad performed such acts as put it in possession of conforming documentation and presented such documentation to Morgan, none of which would necessarily occur.

*Id.* (emphasis in original) (citations omitted).

In the instant case, Union Planters was only the advising bank—merely a conduit through which the transaction would pass. At the time the writ of attachment was served, conforming documents had not been tendered by WESA, and Manufacturers Hanover and the issuing bank had not transferred funds under the letter of credit to Union Planters. In other words, the letter of credit transaction was wholly executory and WESA had no attachable property in Union Planters' hands.

Texas/Hemmert argue that as of the date of service of the writ, the underlying sales contract had been executed and the debt evidenced by the letter of credit was merely "unmatured." They cite *Iran Express Lines v. Sumatrop, AG*, 563 F.2d 648 (4th Cir.1977), for the proposition that maritime law allows the garnishment of an unmatured debt provided it arises from an executed contract. We find *Iran Express* inapposite to the case at bar. It did not involve a letter of credit transaction; rather, the creditor garnished cargo freight belonging to the debtor in the hands of a

shipper. The issue in that case was whether the shipper had any property belonging to the debtor. It seems the actual loading of the ship had been interrupted by a strike; the bills of lading had not yet been delivered and the debt owed to the shipper had not yet matured. Nevertheless, the Fourth Circuit held that, for purposes of a maritime garnishment, the contract of affreightment had been executed and the unmatured status of the debt to the shipper was irrelevant—the shipper had property of the debtor that the creditor could garnish.

We reject Texas/Hemmert's attempt to focus this court's attention on the underlying sales contract. The contract that is relevant to our inquiry is not the sales contract as in *Iran Express*, but the letter of credit itself. A letter of credit is a contract separate and distinct from the underlying sales contract. *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 464–65 (2d Cir.1970). Regardless of the status of the underlying sales contract, until the conforming documents were presented to and accepted by Union Planters, the letter of credit remained wholly executory and WESA had no entitlement to the proceeds thereunder. Therefore, the writ of maritime attachment served prior to execution of the letter of credit was ineffective and void. *Diakan Love*, 584 F.Supp. at 784; *cf. Sisalcords Do Brazil, Ltd. v. Fiacao Brasileira De Sisal, S.A.*, 450 F.2d 419 (5th Cir.1971), *cert. denied*, 406 U.S. 919, 92 S.Ct. 1771, 32 L.Ed.2d 118 (1972) (similar issue decided under Louisiana law).

Texas/Hemmert finally argue that even if the writ was ineffective on the date of service, it nevertheless remained viable to operate against any "after acquired property" until at least the time of the garnishee bank's answer under Rule B(3)(a). We find this argument unavailing for two reasons. Principally, the nature of the Rule B(1) writ is such that it must either attach property on the date of service or be void. *See Reibor Int'l Ltd. v. Cargo Carriers (KACZ–Co.) Ltd.*, 759 F.2d 262, 266 (2d Cir.1985). The *Reibor* court recognized that federal law controlled, *id.*

at 265, but found the federal precedent to be so "thin" that it turned to the analogous law of the State of New York to fill the void. *Id.* at 266 & n. 3. It held that it would be too onerous a burden to expect would-be garnishees who possess no attachable property at the time of service of the writ to remain vigilant until the answer to the writ is prepared. *Id.* at 267. We agree. To the extent that the Rule B(1) writ is a means to secure the appearance of a maritime defendant who is not otherwise found within the judicial district, it can be likened to a fisherman's net cast into the flow of commerce to catch the defendant's assets. The plaintiff is the fisherman, it is the court's net, but the garnishee bank is forced to tend the net and report its catch, if any, within 20 days. *See* Rule B(3)(a). Like the court in *Reibor*, we think the federal writ of maritime attachment is the equivalent of one cast of the net; if the fish are not running on the date of service, the net is returned empty to the court. If anyone is to be burdened with the job of staring at the water watching for fish, it should be the plaintiff and not the garnishee bank.

Returning to the legal landscape, as it were, we note alternative grounds on which to reject Texas/Hemmert's argument. Assuming *arguendo* that the initially unsatisfied writ remains effective until service of the garnishee's answer—which in the instant case was the same date that conforming documents were accepted by Union Planters—there were still no proceeds under the letter of credit to which WESA was entitled because of the previously perfected assignments. In other words, even after the letter was executed, there were no assets to attach.

For the above reasons, we AFFIRM the judgments of the district court in both the interpleader and attachment cases.