**OCEANFOCUS SHIPPING LIMITED, Plaintiff,**

v.

**NAVIERA HUMBOLDT, S.A., Defendant.**

No. 96–0443–CIV.

United States District Court, S.D. Florida.

Nov. 7, 1996.

Timothy Armstrong, Armstrong & Mejer, P.A., Coral Gables, FL, for Plaintiff.

J. Michael Pennekemp, Fowler, White, et al., Miami, FL, for Defendant.

### ORDER OF DISMISSAL

MARCUS, District Judge.

THIS CAUSE comes before the Court upon the Defendant's Motion to Quash Process of Attachment and Garnishment, filed July 8, 1996. This motion is ripe for resolution, and the Court took brief argument on it at the status conference on September 4, 1996. After a thorough review of the record and pleadings, and being otherwise advised in the premises, the Defendant's motion must be and is GRANTED.

### I.

This is an admiralty action to obtain a security interest in anticipation of an arbitrator's ruling on the Plaintiff's claim for damages and indemnification arising out of an alleged breach of a charter party agreement between Oceanfocus Shipping Ltd., a Cyprus corporation, and Naviera Humboldt, S.A., a foreign corporation with its principal place of business in Peru. On October 27, 1995, Oceanfocus executed the subject agreement with Humboldt, pursuant to which Humboldt chartered the vessel M/V Hawk. Humboldt previously had entered into a sub-charter agreement with Contilatin Del Peru, S.A. The M/V Hawk was used to transport a shipment of wheat from Vancouver to Peru in December of 1995. What followed was a series of calamities. As a result of bad weather, both the cargo and the ship itself suffered damage in the course of the voyage. During discharge operations in Callao, Peru, a rope used to tie the vessel to the dock gave way after a swell in the waters of the port. The rope snapped back, hit and killed a local dock worker. After repairs were made, the vessel was ready to sail again on January 18, 1996. It did not actually sail until the 31st, however, because the ship was detained by Peruvian port officials at the insistence of the receiver of the damaged cargo and the parents of the deceased worker.

The charter party agreement that governs the parties' relationship calls for arbitration of disputes in London, England. Nevertheless, Oceanfocus filed this action on February 22, 1996 in order to obtain a security interest in Humboldt's assets pending the outcome of the arbitration. The verified complaint contains five counts. Count I seeks $221,729 in hire payments still owed to Oceanfocus. Count II seeks $74,000 for additional discharge expenses necessitated by damage to the ship during the voyage. Count III seeks indemnity from Humboldt for the $600,000 wrongful death claim filed against Oceanfocus in Peru. Count IV seeks indemnity from Humboldt in the amount of $830,000, which reflects the amount of a "Club Letter" it had to post in order to prevent the arrest of its vessel in connection with a cargo damage action against Oceanfocus in the Peruvian courts. Count V seeks indemnity from Humboldt in the amount of $280,000, which reflects the amount of another "Club Letter" it posted in connection with a separate cargo shortage action filed by the cargo receiver in Peru.

At the same time it filed its complaint, Plaintiff moved for an emergency Order directing the issuance of process of attachment and garnishment on the Defendant's actual and pledged assets at the Miami branch of

Banco Santander International ("BSI" or the "Bank"). The motion was made under Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims. The Rule provides a vehicle for serving process and obtaining "quasi in rem" jurisdiction over a defendant by attaching the defendant's "goods and chattels, or credits and effects in the hands of garnishees . . . if the defendant shall not be found within the district." *See, e.g., Teyseer Cement Co. v. Halla Maritime Corp.*, 794 F.2d 472, 477 (9th Cir.1986).

Based on Oceanfocus' representation that Humboldt could not be located in the Southern District of Florida, this Court granted the Plaintiff's motion on February 22, 1996, directing the attachment and garnishment of "[a]ll funds, goods, chattels, credits, effects, and debts owned by or owed to Naviera Humboldt, S.A.; monies to be paid to discharge debts of Naviera Humboldt, S.A.; and accounts in the name of Naviera Humboldt, S.A., which are in the possession or control of Banco Santander International, 1401 Brickell Avenue, Miami, Florida, to a maximum of $2,800,000, the amount claimed by Plaintiff." On March 13, 1996, Banco Santander filed an answer to the process of attachment and garnishment. In an accompanying affidavit, the Bank represented that it "did not have in its possession any funds, goods, chattels, effects or debts owned by or owed to [Humboldt]." According to the Bank, the Defendant does have a secured line of credit ("LOC") at Banco Santander in the maximum amount of $500,000. Little or nothing remains available under this LOC, however.[1] The Bank also acknowledges that Humboldt's indebtedness to Banco Santander is secured by $526,500 pledged by third parties, but points out that these pledged funds were intended to cover whatever unpaid debts Humboldt might owe to the Bank.

On March 29, 1996, the Plaintiff moved for a default on its complaint, based on the De-

fendant's failure to enter an appearance or submit a responsive pleading. Without opposition, this Court granted Plaintiff's application and entered default on April 18, 1996. Humboldt thereafter moved pursuant to Supplemental Rule E(8) to vacate that default. The Court granted this application, over Oceanfocus' opposition, in an Order dated June 14, 1996.

## II.

Humboldt now has moved under Fed. R.Civ.P. 12(b) to quash service of process and dismiss the complaint for lack of *quasi in rem* jurisdiction. As Humboldt sees it, the Plaintiff's attempt to perfect service and obtain jurisdiction over it pursuant to Supplemental Rule B is ineffective, because the line of credit at Banco Santander is not a good, chattel, credit or effect of the Defendant within the meaning of the Rule; and Plaintiff has not identified or sought to attach any other res owned by Humboldt in the Southern District of Florida. Oceanfocus does not dispute that this action must be dismissed if it cannot identify an appropriate *res* in this District. *See, e.g., Shaffer v. Heitner*, 433 U.S. 186, 196, 97 S.Ct. 2569, 2575–76, 53 L.Ed.2d 683 (1977). It contends, however, that jurisdiction can be predicated on (1) the funds available under the line of credit; or (2) the assets pledged by the third parties.

We turn first to the question of whether the line of credit is an "asset" subject to attachment within the meaning of Supplemental Rule B. A "line of credit" has been defined as a "margin or fixed limit of credit granted by one to another, typically from bank, retailer or credit card issuer to customer, to the full extent of which the latter may avail himself in his dealings with the former, but which he must not exceed[. It is] usually intended to cover a series of

---

1. It is unclear what, if any, positive balance now exists. At the time of its answer, Banco Santander represented that the $500,000 line of credit had been drawn down by $499,452.88. During the status conference before this Court on September 4th, Humboldt added that the small remaining balance has been exhausted by interest charges. Oceanfocus suggests that the Bank improperly drew down the letter of credit to reflect a $118,775.00 transfer by Humboldt to Den Norske London on the same day it received service of process in this case. There is no evidence, however, establishing that this transfer was made after service of the writ of attachment. At all events, for purposes of this motion, we will assume *arguendo* that some funds remained available for borrowing under the line of credit at the time attachment was made.

transactions, in which case, when the customer's line of credit is nearly or quite exhausted, he is expected to reduce his *indebtedness* by payments before drawing upon it further[. It is t]he maximum borrowing power (*i.e.* credit limit) of a person from a financial institution." *Black's Law Dictionary* 978 (6th ed.1990) (citation omitted) (emphasis added). Relying on this definition, Humboldt argues that a line of credit which has been drawn upon is "a debt owed by a debtor to a creditor and cannot in any fashion be characterized as a good, chattel, credit or effect.... A line of credit is better characterized as a liability of the debtor and credit/asset (account receivable) of the creditor." Def. Reply, at 2–3. According to Humboldt, the fact that the Bank agreed to loan it up to $500,000 under certain conditions and subject to certain limitations does not support the proposition that the $500,000 can be deemed one of its assets, since (1) the undrawn funds belong to the Bank until they are drawn in accordance with the terms of the LOC, and (2) Humboldt is obligated to repay any amount it draws down. Humboldt analogizes this arrangement to the limited spending power afforded a credit card customer.

The parties have not cited, and this Court has not found, a published case addressing the proper characterization of a line of credit for purposes of attachment. That being said, many courts have recognized that funds available to a defendant under a letter of credit issued by a third party are not subject to attachment as property of the defendant. In *Union Planters National Bank v. World Energy Systems Associates*, 816 F.2d 1092 (6th Cir.1987), for example, the Court of Appeals affirmed the district court's decision to quash a Rule B attachment where funds available under a letter of credit had not yet come into the defendant's possession. The defendant (WESA), a coal distributor, was the beneficiary of a letter of credit issued by a coal purchaser's Taiwanese bank. Pursuant to the letter, WESA's bank (Union Planters) would credit funds to WESA's account as soon as WESA presented certain documents reflecting that the shipment of coal had been made in accordance with the parties' contract. Union Planters would then obtain reimbursement from a bank associated with the issuer. One of the defendant's judgment creditors served a writ of attachment on Union Planters, seeking to attach all of WESA's assets under its control. The bank responded to the writ by stating that, at the time the writ was served, it had no attachable assets belonging to the defendant. The district court agreed, and rejected the judgment creditor's argument that the funds available under the letter of credit belonged to WESA, since WESA had shipped the coal in accordance with the underlying contract. On appeal, the Sixth Circuit upheld the district court's holding. In so doing, it stressed that, however certain WESA's eventual entitlement to the funds, the funds could not be deemed its property until the appropriate confirmatory documents were tendered to Union Planters. *Id.* at 1097–98. Other courts have echoed this reasoning and applied it in analogous contexts. *See, e.g., Diakan Love, S.A. v. Al–Haddad Bros. Enter., Inc.*, 584 F.Supp. 782, 784 (S.D.N.Y. 1984) (observing that "it would be stretching the conventional meaning of words to consider the beneficiary's interest in a letter of credit as either property [of the defendant] in the hands of the bank or a debt owed to it by the bank"); *see also Reibor Int'l Ltd. v. Cargo Carriers*, 759 F.2d 262 (2nd Cir.1985) (holding that garnishee bank did not possess certain funds of the defendant at the time service was made where the subject funds were not electronically credited to the defendant's account until after the writ had been served); *compare Starboard Venture Shipping, Inc. v. Casinomar Transport., Inc.*, 1993 WL 464686 at *2–3 (S.D.N.Y. Nov. 9, 1993) (holding that plaintiff could use Rule B to attach funds placed in a court-ordered escrow account as security for another claimant, and noting that "[u]nlike situations involving open letters of credit, uncredited transfers, or unpresented bills of lading, in which the coming into existence of the debtor's ownership of funds or the garnishee's possession of them at the time of attachment depended on events that had not yet occurred.. the escrowed funds. existed, and [defendant] had an ownership interest in them").

The logic of these cases makes sense here, and suggests that a mere entitlement to

funds at some point in the future does not constitute the kind of asset that can be attached under the admiralty rules. Like funds available under an open letter of credit or funds awaiting an electronic transfer, funds available under a line of credit do not belong to the defendant unless and until certain conditions are satisfied or certain discrete events occur. Indeed, a far more compelling case can be made for treating funds available under an open letter of credit as assets subject to attachment, since once the specified prerequisites are met, the defendant's right to the funds is unqualified and absolute. With a line of credit, however, any funds drawn by the defendant are essentially loan proceeds that eventually must be repaid. From this standpoint, a line of credit is nothing more than a privilege to incur a debt; and at least under these facts and circumstances, cannot be considered a "good, chattel, credit or effect" within the meaning of Rule B.

Oceanfocus calls our attention to no authorities suggesting that the foregoing case law is unhelpful in this context. It cites a great deal of dicta on the importance of maritime attachment in ensuring the satisfaction of debts and liabilities. *See, e. g., Schiffahartsgesellschaft, etc. v. A. Bottacchi S.A.,* 773 F.2d 1528, 1536 (11th Cir.1985) (en banc) (observing that Rule B attempts to protect creditor's rights and noting that "[m]aritime attachment is designed to assure a defendant's appearance and to secure satisfaction if the suit is successful"); *see also Western Bulk Carriers (Australia) Pty. Ltd. v. P.S, Int'l,* 762 F.Supp. 1302, 1306 (S.D.Ohio 1991) (noting that the spirit of Rule B "is not violated when a party's primary interest in seeking the attachment is obtaining security to satisfy a judgment, rather than simply obtaining *in personam* jurisdiction" over a substantive claim). The *Bottacchi* panel went on to rebuff a substantive due process challenge to Supplemental Rule B. In the case at bar, however, the Defendant is not raising a due process objection or otherwise disputing the usefulness of the attachment remedies in Rule B. Rather, Humboldt simply argues that Oceanfocus has failed to comply with the Rule, since the "assets" it has

attempted to attach are not goods, chattels, credits or effects of the Defendant.

Oceanfocus also places a great deal of emphasis on the case of *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.,* 85 F.3d 44 (2nd Cir.1996). *Aurora* concerned the interaction of a state law right of "set-off" with the rights of attachment afforded under Supplemental Rule B. A distributor who had prevailed before an arbitrator on the merits of his claim against a shipper sought to attach the shipper's account at a bank pursuant to Rule B. Several months later, the bank moved to assert its set-off rights against the account under a New York statute that permitted it to claim the assets in the shipper's account in partial satisfaction of a larger debt it owed to the institution. The statute gave the bank's set-off right priority over earlier-filing creditor attachments. The Second Circuit affirmed the district court's holding that principles of preemption prevented the bank from using its statutory rights to displace the Rule B attachment, concluding that the statute "threatens to undermine the power of federal admiralty courts ... to enforce substantive admiralty law."

Oceanfocus seemingly would have us read *Aurora* as establishing that a bank's interests can never be construed in a manner that defeats a Rule B attachment. Nothing in the Second Circuit's opinion supports this sweeping proposition. To begin with, *Aurora* is wholly distinguishable on its facts. While *Aurora* concerned a statutorily-defined set-off right that the bank invoked only after an otherwise lawful attachment had been made, the case at bar involves a private contractual borrowing privilege created well in advance of Oceanfocus' attempt to perfect service. More to the point, concluding that the line of credit at issue in this case falls outside the reach of Rule B does not wreak havoc with the need to prevent state laws from undermining the uniformity of federal admiralty law and prejudicing the rights of maritime lienholders.

The Plaintiff's additional arguments are equally unavailing. Oceanfocus cites an excerpt from the Federal Arbitration Act, 9 U.S.C. § 8, apparently for the proposition that federal jurisdiction is proper if the ag-

grieved party seizes the subject vessel "or other property of the other party according to the usual course of admiralty proceedings." This sentence adds little or nothing to our analysis. Oceanfocus also suggests, without supporting authorities, that the word "credit" as it appears in Rule B encompasses the line of credit at issue here. We are unconvinced. Absent some indication to the contrary, we believe the word, as used here, refers to an asset due to be paid to the defendant—precisely the opposite of the "debt" that a line of credit permits a customer like Humboldt to incur. Accordingly, we conclude that the LOC available to the Defendant at Banco Santander is not an asset subject to attachment under the admiralty rules.

■ For similar reasons, we find that the collateral pledged to BSI in support of Humboldt's line of credit is not subject to attachment. Humboldt has no claim whatsoever to this collateral, which consists of assets belonging to the third parties. The sole link between Humboldt and these assets is the Bank itself, which may appropriate them in the event that the Defendant defaults on its obligation to repay funds drawn down under the letter of credit. The relationship between Humboldt and the pledged assets is simply too attenuated to support the proposition that these are goods, chattels, credits or effects of the Defendant. Moreover, the pledged assets are intended to protect the Bank, not Humboldt's judgment creditors. As a result, the practical effect of accepting Plaintiff's argument would be to make the pledging parties immediate guarantors of the Defendant's maritime liabilities—an obligation altogether different from the one these parties agreed to undertake with BSI. In the absence of persuasive supporting authorities from Oceanfocus, we are unprepared to interpret Supplemental Rule B in this manner.

For all of the foregoing reasons, the Defendant's motion to quash must be granted. *See, e.g., Western Bulk Carriers,* 762 F.Supp. at 1307 (remarking that "a writ of attachment and garnishment is of no legal effect where no goods, chattels, credits or effects of the defendant are in the hands of the gar-

nishee" on the date the writ is served). While we recognize the importance of Rule B attachment in preserving security interests for parties in the position of Oceanfocus, the language of the Rule cannot be construed in a manner that unfairly prejudices the rights of the parties to whom the subject "goods, chattels, credits and effects" actually belong. Since the Plaintiff's attachment of Humboldt's line of credit at Banco Santander must be quashed, and we are aware of no other basis for our personal or in rem jurisdiction, this Court cannot consider the complaint.

Accordingly, it is hereby

ORDERED AND ADJUDGED that the Defendant's Motion to Quash Process of Attachment and Garnishment is GRANTED, and this action is DISMISSED for lack of jurisdiction. All pending motions not otherwise ruled upon are DENIED AS MOOT.